**CINCINNATI INSURANCE COMPANY,**
Plaintiff–Appellee,

v.

**FLANDERS ELECTRIC MOTOR SERVICE, INCORPORATED,**
Defendant–Appellant.

No. 93–3617.

United States Court of Appeals, Seventh Circuit.

Argued April 12, 1994.

Decided Nov. 7, 1994.

Rehearing Denied Dec. 13, 1994.

---

Karl L. Mulvaney, Martha S. Hollingsworth (argued), Tammy J. Meyer, Barry C. Cope, Bingham, Summers, Welsh & Spilman, Indianapolis, IN, for plaintiff-appellee.

David V. Miller, Bowers, Harrison, Kent & Miller, Evansville, IN, Joseph G. Nassif (argued), Linda W. Tape, Jane Fedder Lazaroff, Coburn & Croft, St. Louis, MO, for defendant-appellant.

Daniel B. Dovenbarger, Pamela Carter, Asst. Atty. Gen., Anita Kimmell, Office of the Atty. Gen., Indianapolis, IN, for Indiana Dept. of Environmental Management, Indiana Atty. Gen., amici curiae.

Eugene R. Anderson, Lester O. Brown, Mayda Prego, Anderson, Kill, Olick & Oshinsky, New York City, for Elec. Apparatus Service Ass'n, amicus curiae.

George Plews, Jeffrey D. Claflin, Plews & Shadley, Indianapolis, IN, for Indiana Mfrs. Ass'n, Inc., amicus curiae.

Laura A. Foggan, Richard H. Gordin, Vicki L. Robinson, Wiley, Rein & Fielding, Washington, DC, for Ins. Environmental Litigation Ass'n, amicus curiae.

Norman T. Funk, Hill, Fulwider, McDowell, Funk & Matthews, Indianapolis, IN, Victor C. Harwood, III, Edward Zampino, Peter E. Mueller, Harwood & Lloyd, Hackensack, NJ, for Aetna Cas. and Sur. Co., amicus curiae.

Before WOOD, Jr., COFFEY, and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Flanders Electric Motor Service, Inc. ("Flanders") appeals from summary judgment granted in favor of its insurer, Cincinnati Insurance Co. ("Cincinnati"). In this declaratory judgment action, the district court held that the pollution exclusion clause contained in three comprehensive general liability policies issued to Flanders by Cincinnati relieved the insurer of any duty to defend or indemnify its policyholder against property damage claims arising from releases of polychlorinated biphenyls ("PCBs") at the Missouri Electric Works ("MEW") site in Cape Girardeau, Missouri over the last two decades. We affirm.

## I. BACKGROUND

Flanders is an electrical service shop that sells and repairs motors and other equipment at its facility in Evansville, Indiana. Between 1971 and 1988, Flanders sent "overflow work"—work that presumably could not be completed by Flanders in a timely fashion—consisting of several electrical transformers to MEW's service shop for repair. Certain of these transformers may have been filled with insulating oil or dielectric fluids contaminated with PCBs.[1]

In the mid 1980s, the Missouri Department of Natural Resources ("MDNR") and the United States Environmental Protection Agency ("EPA") discovered PCB contamination at the MEW site. Extensive investigations conducted by the MDNR and the EPA revealed that the soil at the MEW site contained concentrations of PCBs of up to 58,000 parts per million. The accepted safe level of PCBs in the environment is fifty parts per million.[2] The EPA's Final Report, issued in December 1987, concluded that leaking oil-filled drums and transformers stored at the MEW site caused releases of an unknown

---

1. The district court found, and we agree, that genuine issues of fact exist as to whether any more than two transformers sent by Flanders to MEW contained contaminated oil, and whether any contaminated oil was drained from any transformers sent by Flanders while those transformers were at the MEW site. Nonetheless, these issues, although genuine, are not material to the insurance coverage dispute raised by this appeal. *See* Fed.R.Civ.P. 56(c).

2. *See* 40 C.F.R. § 761.60 (EPA regulations regarding disposal of soils contaminated with PCBs at concentrations of 50 parts per million or greater).

quantity of PCB-laden oil and dielectric fluid over a period of twenty years.

The EPA identified more than six hundred businesses as potentially responsible parties ("PRPs") liable for investigation and remediation costs incurred at the MEW site under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §§ 9601–9675.[3] Each of these entities, including Flanders, had sent oil-filled electrical equipment containing PCBs to the MEW site. By a letter dated June 30, 1987, the EPA notified Flanders that PCB contaminated soils had been found at the MEW site and that Flanders was considered potentially responsible for response costs incurred at the site.[4]

A group of MEW PRPs, not including Flanders, formed a Steering Committee to represent their interests, develop proposals for conducting remedial activities at the site, and conduct settlement negotiations with the EPA. Representatives from the Steering Committee successfully negotiated a settlement agreement with the EPA and, in September 1991, the EPA circulated a proposed Consent Decree to all the MEW PRPs. The letter accompanying the proposed Consent Decree advised each PRP that "any discussion of allocation of liability is for settlement purposes only" and that "[t]hose PRPs who do not enter into the Consent Decree ... will be deemed jointly and severally liable for any costs remaining for EPA to recover."

The proposed Consent Decree allocated responsibility for response costs among the PRPs based, in part, on the total number of transformers each PRP shipped to the MEW site. Flanders challenged the EPA's allocation of responsibility for several transformers shipped and deposited by Flanders at the MEW site. The EPA reduced Flanders's allocation of responsibility for certain transformers drained of their oil prior to shipment to MEW, and allowed Flanders to share its allocation of responsibility with the owners of certain other transformers. Although the EPA reduced Flanders's allocation of responsibility under the formula set forth in the proposed Consent Decree, it continued to consider Flanders a potentially responsible party. Flanders declined to participate in the Consent Decree.[5]

In September 1989, Flanders notified Cincinnati of its status as a PRP at the MEW site. Cincinnati insured Flanders's operations under one primary comprehensive general liability policy extending from 1985 to 1990 and two umbrella policies covering the period from 1978 to 1987.[6] Flanders claimed that under each of these three policies, Cincinnati was obligated to defend and indemnify Flanders against any property damage claims arising from the environmental contamination at the MEW site.

Each of the three policies Cincinnati issued to Flanders contained the identical pollution exclusion clause, stating that coverage would *not* be provided for property damage

3. CERCLA imposes liability for response costs, including investigation and remediation costs, on "any person who by contract, agreement, or otherwise arranged for disposal or treatment ... of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances,...." 42 U.S.C. § 9607.

4. Flanders may have neither caused nor contributed to the environmental contamination at the MEW site. However, its liability is not at issue in this case. The sole question presented by this appeal is whether any one of the three insurance policies issued to Flanders by Cincinnati provides coverage for any property damage claims arising from the contamination at the MEW site.

5. On June 29, 1992, the EPA filed a complaint and lodged the proposed Consent Decree in the United States District Court for the Eastern District of Missouri, *United States v. Union Electric Co.,* Civil Action No. 1:92 CV 00078. Flanders and eleven other PRPs filed a motion to intervene in the EPA's action in order to challenge the entry of the Consent Decree. To date, the district court has not ruled on either the motion to intervene or the Consent Decree.

6. Comprehensive general liability policies offered by domestic insurers generally follow the standard form drafted by the Insurance Services Office and its predecessor organizations. Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 Cornell L.Rev. 610, 621 (1990). All of the policy provisions relevant to this case conform to the provisions of the standard form comprehensive general liability policy.

... arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental; ...

Stated simply, these policies did not provide coverage for property damage arising from pollution unless the release of pollutants could be classified as "sudden and accidental."

The insurer, after investigating Flanders's claim and reviewing its policies, concluded that the property damage arising from the environmental contamination at the MEW site was not the result of a "sudden and accidental" occurrence. Cincinnati rejected Flanders's claim for coverage and, on November 14, 1991, initiated this action for declaratory relief. On August 7, 1992, Cincinnati filed a motion for summary judgment, arguing that it properly denied coverage for Flanders's claim, based on the pollution exclusion clause in each of the three policies. The district court granted Cincinnati's motion for summary judgment, holding that the phrase "sudden and accidental" in the pollution exclusion clause was clear and unambiguous and precluded coverage for property damage claims arising from releases of PCBs at the MEW site that occurred gradually over the course of twenty years.

## II. DISCUSSION

### A. *Standard of Review*

■■■ We review the district court's decision to grant summary judgment *de novo. Fittshur v. Village of Menomonee Falls,* 31 F.3d 1401, 1405 (7th Cir.1994). Summary judgment is proper only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct.

2548, 2552, 91 L.Ed.2d 265 (1986). In determining whether summary judgment is appropriate, we must view the evidence, and all reasonable inferences that can be drawn from the evidence, in the light most favorable to the non-moving party. *Kennedy v. United States,* 965 F.2d 413, 417 (7th Cir.1992); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As a federal court sitting in diversity, we must determine whether the district court properly applied the relevant state substantive law. *Colip v. Clare,* 26 F.3d 712, 714 (7th Cir.1994).

■■■ The issue raised in this case is straightforward: whether, as a matter of Indiana law, the pollution exclusion clause contained in the three comprehensive general liability policies issued to Flanders by Cincinnati precludes coverage for liability arising from the gradual environmental contamination at the MEW site. Our determination of this issue turns on the meaning of the phrase "sudden and accidental" as it is used in the pollution exclusion clause. This case presents a question of Indiana law that to date has not been addressed by the Indiana Supreme Court. Our duty is to determine, as best we can, how this dispute would be resolved by the Indiana Supreme Court. *Todd v. Societe Bic, S.A.,* 21 F.3d 1402, 1405 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 359, 130 L.Ed.2d 312 (1994). Because this area of state law is presently undeveloped, we look to illuminating authority from other jurisdictions. *Id.*

### B. *The "Sudden and Accidental" Exception to the Pollution Exclusion Clause*

The pollution exclusion clause bars coverage for property damages caused by pollution unless the release of pollutants was "sudden and accidental." Flanders argues that the term "sudden" is ambiguous because it is susceptible to more than one reasonable interpretation. Because ambiguous terms must be construed against the drafter of the policy, the insurer, and in favor of the insured, Flanders argues that the court should construe "sudden" to mean simply "unexpected" or "unintended." Flanders reasons that its three policies provide coverage for prop-

erty damage claims arising from the contamination at the MEW site because the contamination was neither intended nor expected. Cincinnati argues that the term "sudden" necessarily incorporates a temporal component and must be interpreted as "abrupt" or "quick." The insurer urges this court to affirm the summary judgment granted in its favor, arguing that the releases of PCBs at the MEW site could be classified as neither abrupt nor quick, but occurred continually over a twenty year period.

Under Indiana law, the interpretation of an insurance policy presents a question of law to be decided by the court. *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind. 1992). The insured has the initial burden of proving coverage under an insurance policy. *Southbend Escan Corp. v. Federal Ins. Co.,* 647 F.Supp. 962, 966 (N.D.Ind.1986). If an insurer relies on an exclusion within a policy to deny coverage, the insurer must establish that the exclusion applies. *Id.*

Clear and unambiguous language in an insurance policy must be given its plain and ordinary meaning. *Fidelity & Guar. Ins. Underwriters v. Everett I. Brown Co., L.P.,* 25 F.3d 484, 486 (7th Cir.1994) (citing *City of Muncie v. United Nat'l Ins. Co.,* 564 N.E.2d 979, 982 (Ind.Ct.App.1991)). An unambiguous provision in an insurance policy must be enforced, even if it results in a limitation of the insurer's liability. *Interstate Auction, Inc. v. Central Nat'l Ins. Group, Inc.,* 448 N.E.2d 1094, 1098 (Ind.Ct. App.1983). However, where the language of an insurance policy is ambiguous, in that it is susceptible to more than one reasonable interpretation, the court must construe the language in favor of the insured. *Alexander v. Erie Ins. Exchange,* 982 F.2d 1153, 1157 (7th

Cir.1993) (citing *Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind.1985)).

Although special rules of construction for terms within insurance policies have been developed due to the disparity in bargaining power between insurers and insureds, *Southbend Escan Corp.,* 647 F.Supp. at 966, a court cannot create an ambiguity where none exists; "if no ambiguity exists the policy will not be interpreted to provide greater coverage than the parties bargained for...." *Alexander,* 982 F.2d at 1157; *see also Heller v. Equitable Life Assurance Society,* 833 F.2d 1253, 1256 (7th Cir.1987) (interpreting Illinois law). If the underlying factual basis of a claim, even if proved true, would not result in liability under an insurance policy, the insurer may properly refuse to defend its insured. *Cincinnati Ins. Co. v. Mallon,* 409 N.E.2d 1100, 1105 (Ind.Ct.App. 1980).

The proper interpretation of the phrase "sudden and accidental" within the pollution exclusion clause of the standard form comprehensive general liability policy has been the subject of enormous debate by courts and commentators alike. *See generally* Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion,* 75 Cornell L.Rev. 610 (1990). There is substantial disagreement among the courts regarding the meaning of "sudden." The highest courts of Colorado, Georgia, Illinois, New Jersey, Washington, West Virginia, and Wisconsin have found the term "sudden" to be ambiguous, and have construed the term "sudden" to mean simply "unexpected" or "unintended."[7] In contrast, the highest courts of Florida, Massachusetts, Michigan, Minnesota, North Carolina, and Ohio have found that the term "sudden" is unambiguous and has a temporal meaning.[8] A majority of

7. *See Hecla Mining Co. v. New Hampshire Ins. Co.,* 811 P.2d 1083 (Colo.1991); *Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686 (1989); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992); *Morton Int'l, Inc. v. General Accident Ins. Co.,* 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied,* — U.S. —, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); *Queen City Farms, Inc. v. Aetna Casualty & Sur. Co.,* 124 Wash.2d 536, 882 P.2d 703 (1994), *corrected,* (Wash. Sept. 29, 1994); *Joy Technologies, Inc. v.*

*Liberty Mut. Ins. Co.,* 187 W.Va. 742, 421 S.E.2d 493 (1992); *Just v. Land Reclamation, Ltd.,* 155 Wis.2d 737, 157 Wis.2d 507, 456 N.W.2d 570 (Wis.1990).

8. *See Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700 (Fla.1994); *Lumbermens Mut. Casualty Co. v. Belleville Industries, Inc.,* 407 Mass. 675, 555 N.E.2d 568 (1990); *Upjohn Co. v. New Hampshire Ins. Co.,* 438 Mich. 197, 476 N.W.2d 392 (1991); *Board of Regents of the University of Minn. v. Royal Ins. Co.,* 517

federal appellate courts, anticipating the interpretation of "sudden" the highest courts in the remaining states might adopt, have ascribed a temporal meaning to the term.[9]

Nearly every court that has examined the term "sudden" within the pollution exclusion clause has initially relied on dictionary definitions. Some dictionaries define "sudden" as "happening without previous notice or with very brief notice; coming or occurring unexpectedly; unforeseen; unprepared for." *See* Black's Law Dictionary 1432 (6th ed. 1990); Webster's Third New International Dictionary 2284 (1981). Other dictionaries define "sudden" as "occurring . . . unexpectedly or without warning, abrupt, abnormally rapid, hurried." *See* The Concise Oxford Dictionary of Current English 1066 (1982).

▮ Flanders argues that because "sudden" has more than one reasonable meaning, evidenced by these varied dictionary definitions, the term is necessarily ambiguous, and the court must apply the primary meaning that favors the insured, *i.e.,* "unexpected" or "unintended." We disagree. The existence of multiple dictionary definitions does not compel the conclusion that a term is ambiguous. *New Castle County v. Hartford Accident and Indemnity Co.,* 933 F.2d 1162, 1193–94 (3d Cir.1991) (dictionaries are "imperfect yardsticks of ambiguity"); *Trico Industries, Inc. v. Travelers Indemnity Co.,* 853 F.Supp. 1190, 1195 (C.D.Cal.1994) ("nearly every word can be considered ambiguous when read by itself and out of context"); *Fireman's Fund Ins. Companies v. Ex–Cell–O Corp.,* 702 F.Supp. 1317, 1324

(E.D.Mich.1988) ("if merely applying a definition in the dictionary suffices to create ambiguity, no term would be unambiguous"). Nor does the presence of profound judicial disagreement over the interpretation of "sudden" make it ambiguous. *New Castle County,* 933 F.2d at 1196; *Fireman's Fund Ins. Companies,* 702 F.Supp. at 1323 n. 7.[10]

We agree that "sudden" connotes an unexpected and unintended event or occurrence. However, "sudden" can also mean "abrupt" or "quick," and we believe that in the context of the pollution exclusion clause, "sudden" must be construed as meaning both "unexpected" and "abrupt." The standard form comprehensive general liability policy excludes coverage for property damage claims arising from pollution unless the release of the pollutants was both "sudden and accidental." An "accident" is generally understood to mean an unexpected or unintended occurrence. *Hartford Accident & Indemnity Co. v. United States Fidelity & Guar. Co.,* 962 F.2d 1484 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992). "Sudden" must necessarily mean more than simply "unexpected" or "unintended" if it is to be given any independent significance. *See Smith v. Hughes Aircraft Co.,* 22 F.3d 1432, 1437 (9th Cir.1994) (quoting *Shell Oil Co. v. Winterthur Swiss Ins. Co.,* 12 Cal. App.4th 715, 755, 15 Cal.Rptr.2d 815 (1993)) (" '[A]ccidental' conveys the sense of an unexpected or unintended event, while 'sudden' conveys the sense of an unexpected event that is abrupt or immediate in nature"); *Northern Ins. Co. v. Aardvark Associates, Inc.,* 942 F.2d 189, 192 (3d Cir.1991) (quoting

---

N.W.2d 888 (Minn.1994); *Waste Management of the Carolinas, Inc. v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374 (1986); *Hybud Equip. Corp. v. Sphere Drake Ins. Co.,* 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993).

**9.** *Aeroquip Corp. v. Aetna Casualty and Sur. Co., Inc.,* 26 F.3d 893, 894 (9th Cir.1994) (construing California law); *Aetna Casualty & Sur. Co. v. General Dynamics Corp.,* 968 F.2d 707 (8th Cir. 1992) (construing Missouri law); *Hartford Accident & Indemnity Co. v. United States Fidelity & Guar. Co.,* 962 F.2d 1484 (10th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 411, 121 L.Ed.2d 335 (1992) (construing Utah law); *Northern Ins. Co. v. Aardvark Associates, Inc.,* 942 F.2d 189 (3d Cir.1991) (construing Pennsylvania law); *A.*

*Johnson & Co. v. Aetna Casualty & Sur. Co.,* 933 F.2d 66 (1st Cir.1991) (construing Maine law); *New York v. AMRO Realty Corp.,* 936 F.2d 1420 (2d Cir.1991) (construing New York law); *United States Fidelity & Guar. Ins. Co. v. Murray Ohio Mfg. Co.,* 875 F.2d 868 (6th Cir.1989) (construing Tennessee law by affirming without opinion 693 F.Supp. 617 (M.D.Tenn.1988)); *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31 (6th Cir.1988) (construing Kentucky law); *Great Lakes Container Corp. v. National Union Fire Ins. Co.,* 727 F.2d 30 (1st Cir.1984) (construing New Hampshire law).

**10.** The fact that the term "sudden" is not defined in the policy likewise does not create an ambiguity. *Harden v. Monroe Guar. Ins. Co.,* 626 N.E.2d 814, 817 (Ind.Ct.App.1993).

*Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. 558, 557 A.2d 393, 402 (1989)) (" '[t]o define sudden as meaning only unexpected or unintended, and therefore as a mere restatement of accidental, would render the suddenness requirement mere surplusage' "); *Lumbermens Mut. Casualty Co. v. Belleville Industries, Inc.,* 407 Mass. 675, 555 N.E.2d 568, 572 (1990) ("[f]or the word 'sudden' to have any significant purpose, and not to be surplusage when used generally in conjunction with the word 'accidental,' it must have a temporal aspect to its meaning, and not just the sense of something unexpected").

Although the Georgia Supreme Court concluded that the multiple meanings of "sudden" rendered the term ambiguous, it explained the full meaning of "sudden" as including an abrupt beginning as well as an element of surprise:

> [I]t is, indeed, difficult to think of "sudden" without a temporal connotation: a sudden flash, a sudden burst of speed, a sudden bang.... [O]n reflection one realizes that ... "sudden" does not usually describe the duration of an event, but rather its unexpectedness: a sudden storm, a sudden turn in the road, sudden death. Even when used to describe the onset of an event, the word has an elastic temporal connotation that varies with expectations: Suddenly, it's spring.

*Claussen v. Aetna Casualty & Sur. Co.,* 259 Ga. 333, 380 S.E.2d 686, 688 (1989). Thus, a child might dart between two parked cars and appear *suddenly* in the path of an oncoming car. An ill patient might take a *sudden* turn for the worse. In turbulence, an airplane might experience a *sudden* change in altitude. As these examples illustrate, a sudden event is one with an abrupt or unexpected onset.[11]

Our interpretation of "sudden" as meaning "abrupt" as well as "unexpected" or "unintended" comports with the Indiana Supreme Court's interpretation of "sudden" in the context of Indiana's Strict Product Liability Act, Ind.Code Ann. §§ 33–1–1.5–1 through 33–1–1.5–8 (West 1983 & Supp.1992). *See Reed v.*

*Central Soya Co., Inc.,* 621 N.E.2d 1069 (Ind. 1993); *Martin Rispens & Son v. Hall Farms, Inc.,* 621 N.E.2d 1078 (Ind.1993). " '[S]udden' contemplates both the elements of time during which the damage occurs, as something marked by abruptness or haste, and the element of surprise in relation to the damage." *Reed,* 621 N.E.2d at 1075; *accord, Martin Rispens & Son,* 621 N.E.2d at 1089 (sudden, major damage "must have happened quickly, unexpectedly and be of a calamitous nature"). We see no reason to construe the term "sudden" in the context of the standard form comprehensive general liability policy any differently than the Indiana Supreme Court has interpreted it in the context of Indiana's Strict Product Liability Act.

■ Flanders argues that the drafting and regulatory history of the pollution exclusion clause contradicts Cincinnati's temporal construction of the clause. Although several courts have considered the public record from the development and regulatory approval of the pollution exclusion, *see, e.g., Morton Int'l, Inc. v. General Accident Ins. Co.,* 134 N.J. 1, 629 A.2d 831 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994), we will not look beyond the unambiguous policy language. *See Dimmitt Chevrolet, Inc. v. Southeastern Fidelity Ins. Corp.,* 636 So.2d 700, 705 (Fla.1994). We believe that the phrase "sudden and accidental" within the pollution exclusion clause is " 'clear and plain, something only a lawyer's ingenuity could make ambiguous.' " *United States Fidelity & Guar. Co. v. Star Fire Coals, Inc.,* 856 F.2d 31, 34 (6th Cir. 1988) (quoting *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423, 1429 (D.Kan.1987)).

■ Applying the unambiguous policy language to the facts of this case, we hold that property damage claims arising from the environmental contamination at the MEW site are outside the scope of coverage provided in Flanders's three insurance policies. The EPA determined that the PCB contamination at the MEW site resulted from years of improper waste handling and storage

---

**11.** Suddenness refers to the nature of the *onset* of the discharge, not to the nature of the damages caused by the discharge. *See Star Fire Coals, Inc.,* 856 F.2d at 34.

practices.[12] The EPA found that spills or leaks of transformer oil and dielectric fluids onto the surface soil had occurred over a twenty year period. Because these releases of PCBs were commonplace events which occurred in the course of MEW's regular business, they cannot be considered sudden and accidental. The fact that one or more of these spills or leaks may have occurred suddenly and accidentally does not alter our conclusion. *See Ray Industries, Inc. v. Liberty Mut. Ins. Co.,* 974 F.2d 754, 768–69 (6th Cir.1992) ("under this theory, *all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment"); *Smith,* 22 F.3d at 1438 (rejecting the insured's effort to "break down its long-term waste practices into temporal components in order to find coverage"). The recurring spills and leaks at the MEW site over a twenty year period were not "sudden and accidental" within the meaning of the pollution exclusion clause.

## III. CONCLUSION

We are persuaded that if the Indiana Supreme Court were presented with this question, it would conclude that the term "sudden," as it is used in the standard form comprehensive general liability policy, is unambiguous and means "abrupt," "quick" or "immediate," as well as "unexpected" and "unintended." The three policies issued to Flanders by Cincinnati exclude coverage for any release of pollutants unless the release was "sudden and accidental." The environmental contamination at the MEW site occurred gradually over the course of more than twenty years. Because this pollution did not occur suddenly, any resulting property damage claims are outside the scope of coverage provided by the policies. Accordingly, the judgment of the district court is

AFFIRMED.

12. The EPA's Final Report described MEW's practices as follows:

During past operational practices MEW recycled the materials from the old equipment, selling copper wire and reusing the dielectric fluids from the transformers. The salvaged transformer oil was filtered through fuller's earth and 90 percent was reused. The remaining 10 percent was wasted.... Portions of the waste transformer oil were given to local residents who utilized the waste oil to control dust.... The remaining oil was either spilled or leaked onto the ground around the MEW building.

The MEW has been at its present location since 1953. Since that time, more than 16,000 transformers have been repaired or scrapped on site. The total amount of transformer oil that has been discarded in this period is estimated to be 28,000 gallons.... In 1984, approximately 5,000 gallons of waste oil was [sic] removed by a removal contractor.