INDIANA INSURANCE COMPANY, an Indiana Corporation, Plaintiff,

v.

PANA COMMUNITY UNIT SCHOOL DISTRICT NO. 8, Defendant.

Pana Community Unit School District No. 8, Third Party Plaintiff,

v.

Richard A. Lees, Siegert–Lees Insurance, Insurance Management Bureau a/k/a Independent Risk Managers, Inc., Third Party Defendants.

No. 98–CV–3121.

United States District Court,
C.D. Illinois,
Springfield Division.

Nov. 29, 2001.

Vincent Patrick Cook, Peter W Schoonmaker, Tonya Marie McCarty, Condon & Cook, Chicago, IL, for Indiana Insurance Co., Indiana Corporation.

Robert V. Ogren, Woodlands, TX, for Anthem Inc.

Everett E. Nicholas, Jr., Lise Alexandra Peters, Robbins Schwartz Nicholas Lifton & Taylor, Decatur, IL, Robert E. Riley, Lorence Slutzky, Robbins Schwartz Nicholas Lifton & Taylor Ltd, Chicago, IL, for School Dist 8 Pana Community Unit.

Michael T. Kokal, Heyl Royster Voelker & Allen, Springfield, IL, Stephen R. Kaufmann, Thomas H Wilson, Sorling Northrup Hanna Cullen & Cochran, Springfield, IL, for Insurance Management Bureau.

Gary S. Schwab, Heyl Royster Voelker & Allen, Springfield, IL, for Richard A Lees.

Gary S. Schwab, Everett E. Nicholas, Jr., Lise Alexandra Peters, Robbins Schwartz Nicholas Lifton & Taylor, Decatur, IL, Robert E. Riley, Lorence Slutzky, Robbins Schwartz Nicholas Lifton & Taylor Ltd., Chicago, IL, for Siegert Lees Insurance.

### OPINION

MILLS, District Judge.

A condemned school building burns down.

The school district seeks $4.5 million to have the building replaced, but the insurer claims that it should only have to pay $50,000 in demolition and removal costs.

Because the policy unambiguously limits liability, summary judgment must be entered for the insurer.

### FACTS

Pana Community Unit School District No. 8 ("Pana") operates several schools in central Illinois and owns a variety of properties. Among the buildings that Pana owns is its Junior High School. The Junior High School consists of a north and south building. The two buildings' total size is 54,526 feet. The north building is approximately 35,000 square feet and the south building is less than 19,000 square feet. Although the buildings are joined by a hallway, classes are only held in the north building. The Illinois Department of Education deemed the south building unsafe in 1981 or 1982, and Pana has used it for little more than storage space and to house the Junior High's laundry and heating facilities since that time.

In 1992, the Indiana Insurance Company ("Indiana") submitted a bid, through its agent Siegert–Lees Insurance, to provide Pana with casualty and property insurance. Pana accepted the bid that Richard Lees helped prepare. Pursuant to bid specifications, the 1992 insurance policy covered all of Pana's buildings on a blanket basis with the exception of the south building. The parties agreed to a replacement cost for each property and listed the south building's value as "0". The 1992 policy did, however, include $50,000 in coverage for demolition and debris removal in the event of damages to the south building.

Indiana issued renewal policies to Pana from 1993 through 1995. The scope of this coverage was essentially the same as in 1992. Thus, in each of these years Indiana excluded the south building from blanket coverage and simply provided $50,000 worth of coverage for demolition and debris removal.

In 1994, Larry Marsh became Pana's superintendent of schools. The following year, Marsh initiated a risk management program which, among other things, was supposed to determine the replacement cost of all of Pana's buildings. Marsh hired ValueQuest International, Ltd. to do

an appraisal. Based on a valuation of 25,000 square feet of gross floor area, ValueQuest concluded that the Junior High School was worth $1,616,031 as of May 30, 1995.

In January 1996, Pana's insurance consultant, Insurance Management Bureau ("IMB"), suggested that Pana re-bid its insurance needs. An IMB customer service representative named Renee Smith spearheaded the re-bidding process. She told Marsh what information he would need to complete the process and forwarded him a Statement of Values that had been included in the 1995 bid specifications. In February, Marsh sent Smith a copy of a June 14, 1995, ValueQuest appraisal which set the value of the Junior High at $1,872,396.

On March 13, 1996, Smith contacted Marsh to discuss the discrepancies between the ValueQuest appraisal and the 1995 Statement of Values. Marsh informed Smith that ValueQuest had not appraised the south building. After Smith advised him that Indiana had excluded the south building from blanket coverage from 1992 through 1995, Marsh told Smith to fully insure the south building. Marsh immediately retained the Pana school district's architects, Gatewood Hance & Associates, to appraise the Junior High. On March 14, Gatewood Hance submitted to Marsh a building replacement cost estimate of $2,325,920. Gatewood Hance based its estimate on square footage totaling 35,730 feet. Marsh forwarded a copy of Gatewood Hance's estimate to Smith on March 15. In April, Marsh signed a Statement of values which listed the replacement cost of the Junior High's north building at $3,323,760.

Smith assumed that the 35,730 square feet on which Gatewood Hance based its estimate reflected the south building's measurements. She began to prepare

modifications for Pana's 1996 bid specifications on March 15. She intended to combine ValueQuest's $1,616,031 estimate and Gatewood Hance's $2,325,920 estimate to get a grand total for the Junior High's worth and to include both of these figures in the bid specifications. Before Smith could complete her modifications, IMB's new purchaser, Debra Callan, ordered Smith's computer to be turned off and for Smith to immediately vacate IMB's premises. Smith's computer was shut down and the changes to the 1996 bid specifications were lost.

When IMB published the 1996 bid specifications on April 17, the specifications did not include Smith's modifications. Smith's modifications were unknown to Lees and Indiana when they received Pana's bid specifications on April 17, 1996. What Lees and Indiana did know was that the "1996 specifications" required blanket coverage for all of Pana's buildings according to the buildings' replacement cost. Pana provided a list of replacement costs for each building, but the south building was still listed at "0" on account of the lost modifications. At Indiana's direction, Lees prepared a bid based on Pana's stated requirements and submitted a bid to Pana "per specs". That is to say, Indiana told Pana that its bid adopted the terms of Pana's 1996 specifications.

In substantial part, Indiana based its bid on the replacement value Pana assigned to each property. Because the 1996 specifications listed "0" as the replacement value for the south building, Indiana did not charge a premium for that building or incorporate its replacement costs as a risk. It did, however, include a $50,000 demolition and debris clause.

On May 20, 1996, Pana awarded Indiana the property insurance contract. The contract went into effect on July 1, 1996, and was renewed for a one-year period running

from July 1, 1997, to July 1, 1998. The contract adopted the coverage requirements stated in the 1996 specifications.

On October 4, 1997, the south building suffered extensive damage as a result of a fire. Pana sought to recover the south building's alleged value, $4,539,587.35, from Indiana. Indiana has brought this declaratory judgment action in the hopes of limiting its liability to $50,000 in demolition and debris removal instead of the $4,539,587.35 in replacement costs that Pana seeks. It seeks summary judgment on this claim.

Pana has filed a cross motion for summary judgment against Indiana. It makes two arguments. First, Pana contends that Indiana breached the 1996 insurance contract by refusing to pay it $4,539,587.35 to replace the south building. In the event its breach theory fails, Pana seeks reformation of the 1996 contract because it and Indiana were allegedly mistaken as to coverage for the south building. Both of Pana's arguments have been adopted by IMB and IMB joins Pana's summary judgment motion in all respects.

## STANDARD

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Herman v. National Broadcasting Co., Inc.*, 744 F.2d 604, 607 (7th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1393, 84 L.Ed.2d 782 (1985). When determining whether factual issues exist, a "court must view all the evidence in the light most favorable to the non-moving party." *See Black v. Henry*

*Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir. 1985). However, "[s]ummary judgment is appropriately entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *See McKenzie v. Illinois Department. of Transportation*, 92 F.3d 473, 479 (7th Cir.1996) (quoting *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552 (1986)).

To successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Rather, he "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587, 106 S.Ct. at 1356 (quoting Fed.R.Civ.P. 56(e)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* Finally, "[a]lthough [the court] must, for purposes of summary judgment review, draw any inferences from the record in favor of [the plaintiff, it is] not required to draw every conceivable inference from the record. [It] need draw only reasonable ones." *See Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir.1995) (citation omitted).

## ANALYSIS

### 1. Breach of Contract

■ To prevail on a breach of contract claim, a party must prove five elements: (1) formation of the contract; (2) terms of the contract; (3) performance by the plaintiff; (4) breach by Defendant, and (5) damages. *Elson v. State Farm Fire and Casualty Company*, 295 Ill.App.3d 1, 229 Ill. Dec. 334, 691 N.E.2d 807, 811 (Ill.App.

1998). The parties in this case focus their attention on two elements: the terms of the insurance policy and Indiana's alleged breach. Indiana argues that because the terms of the policy set the south building's replacement value at "0", it had no duty to pay Pana once the south building was destroyed. Pana contends that the policy is ambiguous since it says that it provides blanket coverage, but then assigns "0" dollars for the building's replacement value.

 Under Illinois law [1], the interpretation of an insurance policy, even an ambiguous one, presents questions of law that are appropriately resolved by summary judgment. *See West Suburban Bank of Darien v. Badger Mut. Ins. Co.*, 141 F.3d 720, 723–24 (7th Cir.1998). The construction of an insurance policy's language is a question of law. *See Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill.2d 90, 108, 607 N.E.2d 1204, 1212, 180 Ill.Dec. 691, 699 (1992) (citations omitted). Contract interpretation follows the four corners doctrine and Illinois courts look only to the language of the contract to determine if it is susceptible to more than one meaning. *See Benedict v. Federal Kemper Assur. Co.*, 325 Ill.App.3d 820, 259 Ill.Dec.2d 543, 545, 759 N.E.2d 23, 25 (Ill. App. 1 Dist.) (citation omitted). If the contract is facially unambiguous—if its words are not susceptible to more than one reasonable interpretation—it is interpreted without the use of parol evidence. *See id.* However, if the court finds that the language of the contract is ambiguous, parol evidence may be admitted to aid the trier of fact in resolving the ambiguity. *See id.*

 When interpreting a contract under Illinois law, a court must ascertain the parties' intent "by construing the policy as a whole while giving due regard to the risk undertaken, the subject matter that is insured, and the purposes of the entire contract." *See Employers Ins. v. James McHugh Constr. Co.*, 144 F.3d 1097, 1104–05 (7th Cir.1998) (citing *Outboard Marine*, 180 Ill.Dec. 691, 607 N.E.2d at 1212 (1992)). Although ambiguities must be resolved in the insured's favor, mere disagreement about the interpretation of an insurance policy does not render it ambiguous. *See Employers Ins.*, 144 F.3d at 1104; *Nat'l Wrecking Co. v. St. Paul Surplus Lines Ins. Co. .*, 11 F.3d 685, 687 (7th Cir.1993) (citation omitted). Courts "will not strain to find ambiguity in an insurance policy where none exists." *See McKinney v. Allstate Insurance Co.*, 188 Ill.2d 493, 497, 243 Ill.Dec. 56, 722 N.E.2d 1125 (1999). When a policy's words are unambiguous, they are afforded their plain, ordinary and popular meaning—even if such a construction results in a limitation of the insurer's liability. *See Employers Ins.*, 144 F.3d at 1104; *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv. ., Inc.*, 40 F.3d 146, 151 (7th Cir.1994) (citations omitted).

Since the insurance policy in affect at the time of the October 4, 1997, fire adopted the 1996 specifications, Pana's insurance coverage is governed by the terms of those specifications. The 1996 specifications list coverage amounts for all eight of Pana's buildings, including the south building. The specifications state that coverage "shall be on a blanket basis with Replacement Cost coverage for buildings, personal property and property in the open to apply to all locations unless otherwise noted." *See* IMB's Ex. 19 at p. 5, ¶ 1 and p. 6, ¶ 1.

---

1. Since the parties do not raise a conflict of law issue, the Court applies the law of Illinois, the state where it sits. *See Wood v. Mid–Valley Inc.*, 942 F.2d 425, 426 (7th Cir.1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.").

The replacement cost for the properties were agreed upon by Pana and Indiana and the amounts were listed in a section entitled "Statement of Values". *See id.* at p. 6 ¶ 3 and p. 9. The "Statement of Values" listed "0" as the replacement cost for the south building. *See id.* at p. 9.

Because the south building was listed in the 1996 specifications and destroyed in the October 4, 1997, fire, Pana claims that the terms of the policy require Indiana to pay $4,539,587.35 for the building's replacement. The Court disagrees.

■■■ Contrary to Pana and IMB's assertions, the inclusion of the south building under a blanket policy does not mean that the building had to be insured for more than the "0" replacement value listed in the 1996 specifications. Simply put,

> blanket coverage represents an upper limit of liability calculated by adding the values of property at certain locations. That blanket limit applies to a loss at any location covered by the blanket. The blanket limit does not apply to those locations that have a sublimit of liability for that location.

*See Allendale Mut. Ins. Co. v. Bull Data Systems, Inc.*, 1994 WL 687579, *3 (N.D.Ill.).

Since the 1996 specifications listed "0" as the south building's replacement value, Indiana never included a value for the south building when offered coverage for the junior high. The "0" replacement value that Indiana listed for the south building appears to be an unambiguous sublimit for its liability. Thus, Pana and IMB are incorrect when they assert that the south building inclusion in a blanket policy obligated Indiana to pay for the building's replacement or created any ambiguity.[2]

■■■ Even if the Court were to accept Pana and IMB's position about the effect of blanket coverage and deem there to be an ambiguity, the risk that Indiana assumed with respect to the south building and the apparent purpose of the 1996 specifications are fatal factors against their coverage arguments. *See Employers Ins.*, 144 F.3d at 1104–05 (7th Cir.1998). The 1996 specifications listed "0" as the agreed replacement value for the south building. The "0" appeared to reflect the worth of a building that had been unfit for use for some fifteen years. Accordingly, Indiana never charged Pana a premium to insure the property. This plainly indicates that Indiana did not assume the risk of paying to replace the south building. Instead, they charged for a $50,000 policy for the building's demolition and removal in the event of an accident.

Furthermore, if the purpose of the insurance contract was to protect Pana against the loss of *valuable* property—and the 1996 specifications unambiguously state that the south building had no value—then the contract provided coverage consonant with that purpose. As such, the purpose of the contract indicates that Pana is not entitled to the relief it seeks.

## 2. Reformation

■■■ Pana argues that if the Court finds that Indiana did not breach its contractual duties, the insurance policy should be reformed to provide $4,539,587.35 in coverage for the south building because the 1996 policy demonstrates that both parties were mistaken as to coverage issues. To succeed in an action for contract reformation under Illinois law, a party must be able to prove five elements. It

---

**2.** Because the words of the policy are unambiguous, it is not necessary to consider trade and usage, course of dealings, or any other extrinsic evidence on which the parties rely. *See Benedict*, 259 Ill.Dec.2d at 545, 759 N.E.2d at 25.

"must show, by strong, clear, and convincing evidence that there has been a meeting of the minds resulting in an actual agreement between the parties, that the parties agreed to reduce their agreement to writing, and, at the time that the agreement was reduced to writing and executed, some agreed upon provision was omitted or a provision not agreed upon inserted, either through mutual mistake or through mistake by one party and fraud by the other." *See Alliance Syndicate, Inc. v. Parsec, Inc.,* 318 Ill.App.3d 590, 603, 251 Ill.Dec. 861, 870–71, 741 N.E.2d 1039, 1048–49 (2000) (citing *Klemp v. Hergott Group, Inc.,* 267 Ill.App.3d 574, 584–85, 204 Ill. Dec. 527, 641 N.E.2d 957 (1994)).

■ Although Pana alleges that the listing of the south building's replacement value as "0" was a mutual mistake, it cannot prove this. "A mutual mistake is one where both parties understand that the real agreement is what one party alleges it to be, then, unintentionally, a drafted and signed contract does not express the true agreement." *See Cameron v. Bogusz,* 305 Ill.App.3d 267, 272–73, 238 Ill.Dec. 533, 537, 711 N.E.2d 1194, 1198 (1999) (citing *Village of Oak Park v. Schwerdtner,* 288 Ill.App.3d 716, 718, 224 Ill.Dec. 271, 681 N.E.2d 586 (1997)). Here, Indiana believed the south building to be worthless and it prepared a bid that reflected this belief. It never intended to provide more than "0" dollars in coverage. Thus, any mistake as to the south building's replacement value was a unilateral mistake by Pana. Reformation is improper under such a circumstance. *See Alliance Syndicate,* 251 Ill.Dec. 861, 741 N.E.2d at 1048–49.

Ergo, Indiana's Motion for Partial Summary Judgment is ALLOWED. Pana's Motion for Summary Judgment on Counts I and II of Its Counterclaim is DENIED. IMB has adopted Pana's motion with respect to Counts I and II and, for the reasons stated above, the Court DENIES its motion as well.