Matthew BROWNLEE, Plaintiff,

v.

CITY OF CHICAGO, an Illinois
municipal corporation,
Defendant.

No. 97 C 3941.

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 17, 1997.

Jacob Pomeranz, Robert A. Seltzer, Cornfield & Feldman, Chicago, IL, for Plaintiff.

Jennifer Anne Naber, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Ltd., Chicago, IL, Patricia Therese Bergeson, Corporation Counsel City of Chicago, Chicago, IL, Joseph Robert Lipton, City of Chicago, Law Dept., Chicago, IL, for Defendant.

### MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Matthew Brownlee had been working as an Electrical Mechanic Apprentice ("EMA") for the City of Chicago just under four years when the City abruptly fired him for allegedly violating its residency requirement. Brownlee's Union protested both the manner of and reasons for Brownlee's discharge through the collectively bargained grievance and arbitration process, to no avail. The arbitrator ruled for the City, finding that Brownlee's discharge was procedurally sound under the Collective Bargaining Agreement ("CBA") and that the CBA gave him no authority to determine whether Brownlee's discharge was substantively proper. Brownlee then brought suit in this Court under 42 U.S.C. § 1983, alleging that the City violated his procedural due process rights by terminating him without notice and a hearing. Before us are the parties' cross-motions for summary judgment, which boil down to a single issue: did Brownlee have a property interest in his job entitling him to procedural due process?[1] Answering in the negative, we grant summary judgment for the City.[2]

### RELEVANT FACTS[3]

Brownlee held the EMA position in the City of Chicago's Department of Aviation from August 1, 1991 until he was fired on May 5, 1995. Def.'s Facts ¶ 3. He was allegedly terminated for failing to remain a Chicago resident while working for the City. Pl.'s Facts ¶ 6. Despite stating this reason for discharge, the City believed that Brownlee's termination demanded neither explanation nor process. In a letter dated two days before Brownlee was fired, the City's Commissioner of Personnel told Brownlee's department head that under the City's Personnel Rules Brownlee was an "exempt program employee," who could be " 'disciplined or discharged at any time for any reason or no reason' " and had " 'no expectation of continued employment.' " Def's Facts Ex. F (quoting City of Chicago Personnel Rule XVIII–A (rev.Feb. 24, 1995)). The Commissioner further opined that "progressive discipline procedures and hearings are not applicable for these employees." Id.

After Brownlee was fired, the International Brotherhood of Electrical Workers Local 134 (the Union to which Brownlee belonged) wrote several letters to City Aviation and Personnel Department officials, informing them that the Union had filed a letter of appeal and a grievance on Brownlee's behalf Def's Facts Ex. G. The Union's position was that Brownlee had a right to a hearing before the City's Personnel Board to refute the charges against him. Id. On June 7, 1995, the Commissioner of Personnel denied the Union's hearing request, responding that "only career service employees are eligible for a hearing before the Personnel Board." Compl. Ex. C. Because Brownlee occupied an "exempt program" (i.e., at-will) position as an EMA, he was not a career service employee entitled to a hearing before termination. Id.

Brownlee never got his hearing; nor did he receive a statement of the charges and evidence against him. Pl.'s Facts ¶ 15; Def's Facts ¶ 14. Consequently, the Union pro-

---

1. At a status hearing held on August 1, 1997, this Court permitted the parties to litigate the case as follows. First, they would file cross-motions for summary judgment on the liability issue, i.e., whether the City violated Brownlee's procedural due process rights. If Brownlee prevailed on liability, then the parties would conduct discovery on (and brief) whether Brownlee suffered damages, i.e., whether receiving due process would have changed the termination decision.

2. Because Brownlee's motion centers on the very same issue, we deny it.

3. The facts are derived from the parties' Local General Rule 12(M) and 12(N) statements, referred to as "Def's Facts" and "Pl.'s Facts," respectively.

ceeded to the next step in the CBA's grievance process—binding arbitration.

The arbitration focused on provisions in the parties' CBA relating to Brownlee's employment classification. One question the parties presented to the arbitrator is relevant here: whether the City violated the CBA by firing Brownlee without thirty days' notice or a hearing before the Personnel Board. Def's Facts Ex. E (*City of Chicago v. IBEW, Local 134*, Grievance No. 102 (Sept. 17, 1996 ) (Hill, Arb.)), at 3. The Union argued that these notice and hearing rights stem from Brownlee's status as a career service employee. *Id.* It claimed that the source of this status is the CBA, which provides that City employees who complete six months of probationary service become career service employees.[4] *Id.* Under this provision, Brownlee automatically received a promotion to career service after the first six months of his employment. *Id.* The Union further contended that, along with career service status, the CBA furnished the right to a Personnel Board hearing before discharge—a right that Brownlee had been denied.[5] *Id.* at 4. The City countered that Brownlee was classified not as career service but rather as an "exempt program employee" under the City's Personnel Rules, which the CBA incorporated by reference. *Id.* at 7–8. The strongest evidence of non-career service classification lay in the Apprenticeship Agreement ("AA") appended to the CBA, which governs EMAs and withholds career service status until the EMA completes a four-year apprenticeship.[6] *Id.* at 9. Because the AA provides an alternative track to ca-

reer service for EMAs (four years instead of six months), preempts contrary CBA provisions, *see* Def's Fact Ex. B, at 1, and has a bargaining history revealing that EMAs are to be employed at will, the City maintained that the AA unequivocally removed Brownlee from the CBA's career service category. *Id.*

The arbitrator agreed with the City. Charged only with interpreting the CBA, the arbitrator held that the CBA did not accord Brownlee notice or hearing rights. *Id.* at 16. The parties agreed that these rights belong solely to career service employees; as such, the arbitrator determined that the dispositive issue was whether "the Grievant attain[ed] 'Career Service status'" or, alternatively, was an "'exempt program employee.'" *Id.* at 11. The arbitrator found that Brownlee fell into the latter category. *Id.* at 13. As between the CBA's six-month probationary path to career service and the AA's four-year career service track for EMAs, the AA's scheme controlled Brownlee's status. *Id.* at 12–13. The AA preempted conflicting CBA provisions, and its bargaining history, gleaned from arbitration hearing testimony, supported interpreting its language as precluding career service status "until [Brownlee] completes his apprenticeship training." *Id.* at 13–15. Fired short of finishing his training, Brownlee did not satisfy the AA's requirements for career service. *Id.* at 13. Furthermore, other evidence belied Brownlee's claim to career service status: he had never been compensated as a probationary career service employee, and personnel work histories, action reports, and Union activity

---

4. CBA Article 8.5 provides: "New employees will be regarded as probationary employees for the first six (6) months of their employment and will receive no seniority or continuous service credit during such probationary period. Probationary employees continuing in the service of the Employer after six (6) months shall be career service employees and shall have their seniority made retroactive to the date of their original hiring." Def's Facts Ex. A, at 19.

5. The Union relied for support on CBA Article 11, which states that "an employee. shall be guaranteed, upon request, a fill hearing before said Board, in accordance with the said [sic] Board's rules." Def's Facts Ex. A, at 28.

6. This argument was premised on AA paragraph 9, which sets the term of apprenticeship at four years, and AA paragraph 11, which states that "[a]pprentices who successfully complete the apprenticeship training and are graduated by the Electrical Joint Apprenticeship ... shall not be required to file an application for a position as an Electrical Mechanic, but will be appointed as Journeyman Electrical Mechanics with full career service status if vacancies and funds permit." Def's Facts Ex. C, at 2. The City maintained that the Agreement's bargaining history supported reading this language to mean that EMAs cannot become career service employees until after their four-year apprenticeship is over, and then only if funds permit. Def's Facts Ex. E, at 9.

reports all referred to Brownlee as an "exempt program employee." *Id.* at 12.[7]

His Union having lost the battle for procedural rights in arbitration, Brownlee takes a different approach before this Court. He eschews reliance on the CBA, and argues instead that the City of Chicago's Municipal Code and Personnel Rules confer a Fourteenth Amendment Due Process property interest in his position as EMA. These two sources, he contends, establish that the EMA is in fact a career service position, accompanied by procedural due process rights to notice and a hearing before discharge. The CBA is not to the contrary, but simply cedes authority to the Code and Rules on all discharge issues. In short, Brownlee steers this Court toward the Code and Rules as the origin of Brownlee's property interest in continued employment. Conversely, the City claims that the CBA and the AA are the exclusive documents governing Brownlee's employment status and procedural rights. Under Illinois law, the CBA and its appended AA preempt any conflicting Municipal Code sections and Personnel Rules. The City points out that the arbitrator, who has the last word on questions of CBA interpretation, has already decided that the CBA and AA do not accord Brownlee career service status or notice and hearing rights. The City urges the Court not to permit Brownlee to subvert the arbitrator's decision under the guise of a constitutional claim.

Based on these arguments, our task is to decide which of these various sources—the Code, Rules, CBA or AA—governs Brownlee's employment status. Then we must determine what status that source (or sources) assigns to Brownlee. If the answer is career service status, the parties agree that Brownlee has a property interest in his job entitling him to procedural due process before termination. Any other answer is fatal to Brownlee's constitutional claim.

7. A related issue before the arbitrator was whether Brownlee's discharge was substantively proper, that is, whether he could be discharged without "just cause." Def's Facts Ex. E, at 16. The arbitrator found, however, that he lacked subject matter jurisdiction to answer this question because the CBA contained no just cause provision covering exempt program employees. Instead,

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Service, Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the nonmovant's favor. *Cincinnati Ins.,* 40 F.3d at 150. But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material fact," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 261, 106 S.Ct. at 2516; *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge deciding a motion for summary judgment. *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513.

When the parties submit cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for one side or the other. *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id; Buttitta v.*

the CBA declared that "[d]isciplinary action including discharge, shall be excluded from this grievance procedure" and "governed exclusively by the City of Chicago's Personnel or Police Board Rules." *Id.* at 17; Def's Facts Ex. B, at 27–28. As such, the arbitrator held that a substantive review of Brownlee's discharge was beyond his authority. Def's Facts Ex. E, at 17.

*City of Chicago,* 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd,* 9 F.3d 1198 (7th Cir. 1993). This is more of a semantic exercise here because both parties' motions spotlight the same issue: did Brownlee have a property interest in his job as contemplated by the Fourteenth Amendment's Due Process Clause?[8]

## ANALYSIS

### I. Legal Standards Governing Procedural Due Process Claims

■ Procedural due process claims under the Fourteenth Amendment must satisfy a two-part inquiry: 1) the plaintiff must show that he possesses a constitutionally protected property interest; and 2) the plaintiff must demonstrate that he was deprived of that interest without due process. *Kim Const. Co. v. Board of Trustees,* 14 F.3d 1243, 1245 (7th Cir.1994) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Listenbee v. City of Milwaukee,* 976 F.2d 348, 351 (7th Cir.1992)). "Unless [the plaintiff] can establish as a matter of federal constitutional law that [his] claim is based on a protected property interest, the issue of whether [he] was afforded due process before being deprived of that interest does not arise." *Id.* (citations omitted).

■ Whether a public employee has a constitutionally protected property interest in his job depends on whether he has a "legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). Job entitlements are not created by the Constitution, but rather "are defined by existing rules or understandings that stem from an independent source such as state law," id, for example, a city ordinance or an implied contract, *see Bishop v. Wood,* 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976). If these independent sources confer upon the public employee a "legitimate claim of entitlement to continued employment," he meets

his burden of proving a constitutionally protected property interest, and must receive due process of law before termination. *Perry v. Sindermann,* 408 U.S. 593, 602–03, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972), *overruled on other grounds, Rust v. Sullivan,* 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). The "hallmark of a property interest in continued employment" is a provision prohibiting the employee's removal except for "just cause"; in contrast, authorization to terminate an employee at will belies any property interest in continued employment. Harvey Brown & Sarah V. Kerrigan, *42 U.S.C. § 1983: The Vehicle for Protecting Public Employees' Constitutional Rights,* 47 BAYLOR L. REV. 619, 633 (1995) (citations omitted).

The parties agree that only career service employees possess a protected property interest in continued employment which, in turn, entitles them to a post-termination hearing before the City's Personnel Board. *See Ciechon v. City of Chicago,* 686 F.2d 511, 517 n. 3 (7th Cir.1982) (career service paramedic with City of Chicago "had a property interest in her job based on the statutory requirement that permanent career service employees of the City not be discharged without cause.") (citing Chicago Mun.Code ch. 25.1–6; City of Chicago Personnel Rule XVI, §§ 3–4); *see also Santella v. City of Chicago,* 936 F.2d 328, 330–32 (7th Cir.1991) (finding city employee's inability to establish career service status fatal to his assertion of a property interest in employment). The parties diverge on whether Brownlee attained that status.

### II. The Parties' Arguments

#### A. Brownlee's Position—The Code and Rules Govern and Award Career Status

Brownlee claims that Chicago's Municipal Code and the City's Personnel Rules accord him career service status. The Code sets forth thirteen categories of City employment, including "positions exempted from

---

**8.** Brownlee originally brought his constitutional claim under both the Fifth and Fourteenth Amendments. But as the City points out, Brownlee cannot rely on the Fifth Amendment because he alleges no action taken under color of

federal authority. *See Monitor v. City of Chicago,* 653 F.Supp. 1294, 1299 (.D.Ill.1987). Accordingly, we recast his claim as brought under the Fourteenth Amendment only.

the career service," and "career service" employees, defined as all employees not falling within one of the other twelve categories. Chicago Mun.Code § 2–74–030(12)-(13). The Rules track this scheme, distinguishing in Rule III between career service and exempt positions. One type of exempt classification is "exempt program" status, which applies to employees in "such programs as student work experience programs, trainee programs, federal public service employment programs, and any other programs, which, because of the program requirements, cannot be subject to Career Service requirements." Rule III, § 3–3. Authority to classify all exempt positions is reposed in the Commissioner of Personnel, following an elaborate procedure that begins with a department head recommending the exemption in writing, continues through mayoral approval, and ends with the Commissioner relaying the ultimate decision to the department head. Rule I, § 11 Rule III, § 3–4. It is undisputed that the City did not invoke these procedures with regard to EMA employees.

Just as the Rules subdivide exempt positions, they create subcategories of career service positions, one of which is "probationary appointment." Rule III, § 1–2. A probationary career service appointment is bestowed upon new employees for the first six months of their employment, the Rules provide that "probationary employees continuing in the service of the employer beyond their probationary period shall be Career Service employees." Rule IX, §§ 1, 3; Rule III, § 4. Employees achieving career service status through this method must undergo a sixty-day evaluation period. Rule III, § 4; Rule IX, § 1. Career service employees differ from non-career service employees (such as exempt program workers) in a critical respect: they are entitled to a post-termination hearing before the Personnel Board and a written statement of the charges against them, whereas non-career service employees are employed at-will and may be "discharged at any time for any reason or no reason and have no expectation or continued employment." Rule XVIII, § 5; Rule XVIII–A.

From these provisions, Brownlee devises a three-part syllogism. Brownlee cannot be an exempt program employee because the City never used the Personnel Rules' elaborate procedures to exempt EMAs from career service. Since the EMA job does not fall under the exempt program or any other specific classification in section 2–74–030 of the Municipal Code, Brownlee's job became a career service track position by "default." Having worked for the City for almost four years, there is no question that Brownlee completed the six-month probationary period that, under the Rules, ends in an automatic career service appointment.

## B. The City's Position—The CBA and AA Preempt These Rules and Make EMAs Employees At–Will

The City responds that these Code and Rule provisions conflict with the CBA and AA's conditions for EMA career service status, which undisputedly apply to Brownlee through his Union membership. According to the City, the AA supplants the Code and Rules' default six-month probationary career service track with a four-year apprenticeship period for EMAs. Only after completing this period may the EMAs "be appointed as Journeyman Electrical Mechanics with full Career Service status," and then only if "funds and vacancies permit." AA ¶ 11. By implication, this language withholds career service from EMAs until graduation. The City maintains that this interpretation is supported by the AA's bargaining history and by the arbitrator's decision.

Because Illinois law declares that a collective bargaining agreement supersedes any contrary statutes, ordinances, rules, or regulations relating to conditions of employment, see Illinois Public Labor Relations Act, 5 ILCS 315/15(b) (1993), the City argues that this conflict must be resolved in favor of the CBA and AA. The AA was made an addendum to the CBA and, just as the CBA preempts conflicting Code and Rule provisions, so does the AA. The AA overrides contrary CBA provisions as well. AA at 1.

## III. Discussion

### A. The CBA and AA Preempt the Code and Rules By Imposing Non–Career Service Status on EMAs

▮] After considering the parties' arguments and proffered sources, we conclude

that Brownlee was subject to the AA's four-year career service track for EMA employees. The Code and Rules set forth general categories of employment, which include "probationary career service" and "exempt program" positions. To the extent the CBA and AA's terms do not conflict with these general classifications, the CBA and AA are consistent with the Code and Rules.[9] Where the contractual and regulatory sources diverge is on the employment status assigned specifically to the EMA position. We cannot reconcile the Rules' six-month probationary period for all "new employees" with the AA's four-year apprenticeship track to career service for EMAs. As between the two, the four-year AA scheme covers Brownlee because EMA employment status is a "condition of employment" on which the CBA and its incorporated AA have the last word under Illinois law.[10] *See* 5 ILCS 315/15(b) ("[A]ny collective bargaining contract between a public employer and a labor organization executed pursuant to this Act shall supersede any contrary statutes, charters, ordinances, rules or regulations relating to wages, hours and conditions of employment and employment relations adopted by the public employer or its agents.").[11]

Even if the Rules and Code did not conflict with the CBA and AA, Brownlee is not permitted to claim separate rights based on state-law provisions whose subject matter overlaps the CBA and AA's terms. In *Bartoszewski v. Village of Fox Lake*, 269 Ill.App.3d 978, 986, 207 Ill.Dec. 360, 647 N.E.2d 591, 597 (1995), the court held that the union

member plaintiffs could not sue for overtime compensation based on a Village ordinance when the CBA "plainly covers the matter of preshift overtime work." As the court explained, "[t]hat the plaintiffs would have had another legal theory on which to proceed did not remove the dispute from the ambit of section 7.3 [of the CBA]." *Id.* at 987, 207 Ill.Dec. 360, 647 N.E.2d at 597. Similarly, *Quist v. Board of Trustees*, 258 Ill.App.3d 814, 818–19, 196 Ill.Dec. 262, 629 N.E.2d 807, 810 (1994), held that the plaintiffs could not advance claims based on state statutory provisions for reviewing non-tenured faculty when the CBA already set forth procedures for such review. In both cases, the plaintiffs waived their claims because they failed to take advantage of CBA provisions through the grievance and arbitration process. Although our case is different in that Brownlee did exhaust administrative remedies, it does not change the governing principle in these cases union-member employees such as Brownlee cannot eschew CBA provisions in favor of other state-law sources that cover the same subject—here, employment status.

While we write on a blank slate with our determination that the AA is the operative employment status source for EMAs, our conclusion that the AA subjects EMAs to a four-year career service track finds support in the arbitrator's decision. *See McDonald v. City of West Branch*, 466 U.S. 284, 292 n. 13, 104 S.Ct. 1799, 1804 n. 13, 80 L.Ed.2d 302 (1984) ("[A]n arbitral decision may be admitted as evidence in a § 1983 action."); *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 60,

9. As such, the City's arbitration position that the CBA generally incorporates the Code and Rules' employment classifications is not inconsistent with the City's argument here that the CBA and AA preempt those classifications with respect to EMAs.

10. As the Union pointed out during the arbitration proceedings, CBA Article 8.5 incorporates the Personnel Rules' six-month probationary career service appointment for new employees. But this does not aid Brownlee because the AA trumps the CBA as well as the Code and Rules: "In the event of conflict [with the CBA] the terms of this Apprenticeship Agreement shall control." AA at 1.

11. Brownlee tries to undermine the clear language in this statutory section with the Illinois Supreme Court's decision in *City of Decatur v.*

*American Federation of State, County, and Municipal Employees, Local 268*, 122 Ill.2d 353, 119 Ill.Dec. 360, 522 N.E.2d 1219 (1988), claiming that the opinion "suggested that a collective bargaining agreement could not take away statutory benefits under Section 7 of the Illinois Public Labor Relations Act, 5 ILCS 315/7." Pl. Reply at 3 n. 2. This interpretation of *Decatur* is indefensible. The issue there was not how to resolve conflicts between contractual CBA provisions and City regulations, but rather whether the City's civil service provisions could remove subjects from the mandatory collective bargaining duties set out in ILPLRA section 7. *Id.* at 365, 119 Ill.Dec. 360, 522 N.E.2d at 1224. But ILPLRA section 7 has no application here; the City is arguing preemption based on section 15.

94 S.Ct. 1011, 1025, 39 L.Ed.2d 147 (1974) (district court has discretion to "admit an arbitration decision into evidence [and] accord it such weight as is deemed appropriate."); *Jackson v. Bunge Corp.*, 40 F.3d 239, 245 (7th Cir.1994) (same) The arbitrator ruled that Brownlee was a non-career service employee based on City and Union documentation calling Brownlee an exempt program employee, the fact that Brownlee was not compensated as a probationary career service employee, and the AA's provisions. Def.'s Ex. E, at 12–15. He construed the AA's pronouncement that EMAs "will be appointed as Journeyman Electrical Mechanics with full Career Service status" after four years to mean that an EMA like Brownlee is in an "exempt classification and ... not accorded Career Service status until he completes his apprenticeship training." *Id.* at 13. This interpretation was based on the AA's bargaining history, adduced during the arbitration hearing, which revealed the Union's acceptance that EMAs would be classified as non-career service employees. *Id.* at 13–15.

We accord this interpretation great weight, if not complete deference. *Pollard v. Azcon Corp.*, 1995 WL 443939 at *7 n. 3 (N.D.Ill. July 25, 1995) (" 'The court should defer to the arbitrator's construction of the contract."). The arbitrator is the ultimate authority on the meaning of labor agreement provisions, *see Jasper Cabinet Co. v. United Steelworkers*, 77 F.3d 1025, 1028 (7th Cir. 1996), and his interpretation of the AA's bargaining history is an arguable, if not eminently reasonable, construction of the AA, *see United Paperworkers Intern. Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 370, 98 L.Ed.2d 286 (1987). Deference is especially appropriate in this case because the CBA declares that the arbitrator's decision on its meaning "shall be final and binding on all parties to the dispute, including the employee or employees involved." CBA art. 11, § 11.3. Having determined that the CBA and AA govern Brownlee's employment sta-

tus, we see no reason to second-guess the arbitrator's conclusion on what those sources say about his status,[12] a determination contractually committed to his judgment and squarely within his expertise. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960) ("[T]he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for....").

Brownlee counters with two points in an effort to undermine the relevance of the CBA and the arbitrator's decision. First, he contends that the CBA and AA cede authority to the Code and Rules on the issue before us because the CBA states that "discharges shall be governed exclusively by the City of Chicago's Personnel or Police Board Rules...." CBA art. 11, § 11.1(a). Second, Brownlee argues that he must be a career service employee because the City never went through the exemption procedures for EMAs and because the CBA and AA do not explicitly classify EMAs as exempt. Neither contention has merit.

Brownlee's first argument fundamentally misconceives the issue in this case. We are not at this point concerned with the procedural or substantive propriety of Brownlee's discharge. Rather, the threshold question we must ask is whether Brownlee had a property interest in his job. That question is answered by determining Brownlee's employment status—career service or non-career service—not by examining the City's requirements or processes for discharge. *See Kim Const. Co. v. Board of Trustees*, 14 F.3d 1243, 1244 (7th Cir.1994) ("Although [a] State may choose to require procedures against deprivation of substantive rights, ... in making that choice, the State does not create an independent substantive right."). CBA Article 11 simply excludes "[d]isciplinary action, including discharge ... from this grievance procedure" and hands it over to the City's "Personnel or Police Board Rules,

---

12. Brownlee contends that the arbitrator's decision about his employment status was flawed because it was "based on the City's evidence" that it had gone through the exemption procedures. Pl. Br. S.J. at 10, We disagree. The

arbitrator's opinion does not rely on the City's compliance with exemption procedures; instead, it is premised on the AA, as well as City and Union documentation referring to Brownlee as an exempt program employee.

whichever may be applicable." Nothing in this language relinquishes the CBA or AA's authority to determine employment status.[13]

Equally infirm is Brownlee's argument that he is a career service employee by virtue of the City's failure to follow the Personnel Rules' exemption procedures. Just as the AA preempts conflicting Rules on the EMAs' path to career service, it trumps the Rules' detailed exemption procedures by classifying EMAs through the collective bargaining process. 5 ILCS 315/15(b).

The arbitration hearing testimony on the AA's negotiation supports this conclusion. Joan Cole, the City's primary negotiator, testified that granting career service status immediately after the EMAs' four-year apprenticeship was a concession to the Union that EMAs would not have to complete an additional six-month probationary period when they graduated and became Electrical Mechanics. Pl. Motion S.J. Ex. 2, at 81–82, 89. As such, the Union understood that the EMAs "were trainees, and as trainees they had no status .... they would be at-will employees and under the exempt program category because that is the category that covers trainees." *Id.* at 83–84. Relying on this testimony, the arbitrator found that the Union consented through the negotiation process to classify EMAs as non-career service employees until they finished their apprenticeship.[14] Def.'s Facts Ex. E, at 13–14. Grounded in evidence of the parties' intent,

this contractual interpretation deserves our deference.[15]

For the same reason, we give no weight to the fact that the CBA and AA do not explicitly designate EMAs as "exempt program employees." The AA's collective bargaining history as interpreted by the arbitrator reveals that the Union (and therefore Brownlee) accepted that EMAs would be non-career service employees; whether they were categorized as exempt or some other non-career service classification is beside the point. And there is no evidence that, under the CBA and AA, the only two available statuses are exempt program and career service.[16] We stress that it is Brownlee's burden to prove that he attained career service status, not the City's responsibility to establish that Brownlee fell within some particular sub-classification of non-career service.

## B. Brownlee Cannot Divorce His Constitutional Claim From His Employment Status Under the CBA and AA

■ The fact that Brownlee never achieved career service status defeats his section 1983 claim. When a constitutional claim is premised on an issue that was resolved against the plaintiffs union as a matter of CBA interpretation during grievance and arbitration proceedings, the claim fails as a matter of law because the court " 'must defer to this interpretation of the agreement unless

---

13. Because we conclude that CBA article 11 is irrelevant to the property interest determination, we need not pass on the City's argument that the article's reference to "Personnel or Police Board Rules" means the administrative rules governing hearings before the Personnel or Police Board, not the substantive provisions contained in the City of Chicago Personnel Rules. We do note, however, that this argument is not without some force. Article 11 casts "Personnel and Police Board Rules" as equivalents, and a comparison of the Administrative Hearing Procedures of the Personnel Board and the Police Board Rules of Procedure reveals that both establish hearing procedures before City administrative bodies. *See* Def's Reply Ex. 1 & 2.

14. As the EMAs' exclusive bargaining representative, see CBA art. 1, § 1.1, the Union was empowered to "agree to terms and conditions that are contractually binding on all of the employees." *Dykes v. Southeastern Pennsylvania*

*Transp. Auth.*, 68 F.3d 1564, 1569 (3d Cir.1995) (citations omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 1434, 134 L.Ed.2d 556 (1996). Accordingly, Brownlee was bound by the outcome of the AA's negotiation.

15. We acknowledge that the arbitrator did not have authority (nor did he attempt) to address conflicts between the CBA and the Personnel Rules' exemption procedures. However, his finding that the Union agreed to classify EMAs as exempt during the bargaining process informs our analysis because it sets up a conflict between the AA and the Personnel Rules—which Illinois law requires us to settle in the AA's favor.

16. Even if exempt program was the only non-career service status option under the CBA and AA, putting Brownlee into this category is consistent with the exempt program status, which applies to many trainee and work experience programs. Rule III, § 3.3.

the employee can show that the union has breached its duty of fair representation....'" *Dykes v. Southeastern Pennsylvania Transp. Auth.,* 68 F.3d 1564, 1570 (3d Cir.1995) (quoting *Bolden v. SEPTA,* 953 F.2d 807, 829 (3d Cir.1991)), *cert. denied,* —— U.S. ——, 116 S. Ct. 1434, 134 L.Ed.2d 556 (1996).

Dykes was a bus driver who got fired for refusing to submit to his employer's urinalysis test. His union pursued the matter through a three-step grievance procedure, contending that the employer had violated a CBA provision permitting drug testing only upon reasonable suspicion. At each step, the union lost, based on the determination that the employer had satisfied the CBA's reasonable suspicion criterion. *Id.* at 1566. Dykes subsequently filed a section 1983 suit in federal court, alleging that his employer's insistence on the drug test on pain of job loss violated his Fourth Amendment right against unreasonable search and seizure. *Id.*

Relying heavily on its 1991 decision in Bolden v. SEPTA,[17] the Dykes court affirmed the district court's decision to dismiss the 1983 claim because it turned on a fact issue resolved during the grievance process. Dykes' Fourth Amendment claim asserted that the employer lacked a reasonable suspicion to subject him to drug testing. *Id.* at 1568. Because the CBA defined reasonable suspicion, this was a question "of fact to be determined during the course of the grievance process and ... the finding reached during this process is binding upon the reviewing court." *Id.* Dykes could not subvert this unfavorable administrative resolution by relitigating reasonable suspicion through constitutional avenues. *Id.* The court explained that what stood between Dykes and his Fourth Amendment claim was not res judicata or collateral estoppel, but the simple fact that Dykes' union had authority as his exclusive bargaining representative to "'validly consent to terms and conditions of employment, such as submission to drug testing, that implicate employees' Fourth Amendment rights.'" *Id.* at 1569 (quoting *Bolden,* 953 F.2d at 826). A separate constitutional

claim was possible only if the union had breached its duty of fair representation during the grievance proceedings. *Id.* at 1570.

*Dykes* makes clear that when a constitutional claim depends on a fact question decided through labor grievance and arbitration procedures, the court is in no position to alter that resolution through constitutional analysis. Yet that is exactly what Brownlee would like us to do. His due process claim is dependent on our finding, contrary to the arbitrator, that he possessed a property interest in his position as EMA entitling him to a post-termination hearing before the Personnel Board. But the arbitrator concluded, based on the CBA and AA, that the Union and City agreed that EMAs would not become career service employees entitled to procedural protections against discharge until completing a four-year apprenticeship, and that Brownlee lacked career service status because he never satisfied this requirement. Having held that the CBA and AA govern Brownlee's employment status, we cannot furnish an answer inimical to the arbitrator's simply because it comes clothed in constitutional garb. Instead, we must defer to his construction of the CBA in the absence of any allegation that Brownlee's union breached its duty of fair representation.

This result follows from the fact that Brownlee's Union serves as his exclusive bargaining representative. *See* CBA art. 1, § 1.1. As such, it has the power to consent to conditions of employment on its members' behalf, even if those conditions "entail[ ] some restrictions on constitutional rights that individual employees would otherwise enjoy." *Dykes,* 68 F.3d at 1569 (citations and internal quotations omitted). The right implicated in Brownlee's case is his property interest in employment, which the union relinquished during AA negotiations by agreeing that EMAs would have a four-year track to career service status. Likewise, Brownlee's union agreed that the arbitrator's resolution of disputes based on CBA interpretation "shall be final and binding on all parties to the dispute, including the employee or employees involved." CBA art. 11, § 11.3.

---

**17.** Because the *Dykes* court conducted a painstaking analysis of the *Bolden* decision, we decline

to repeat that exercise here, and instead incorporate it by reference.

To permit individual employees to escape the concessions of their exclusive bargaining representatives would defeat the utility of union representation and undermine the collective bargaining process.

Brownlee relies on *McDonald v. City of West Branch,* 466 U.S. 284, 104 S.Ct. 1799, 80 L.Ed.2d 302 (1984), in asserting that his section 1983 claim should be allowed to proceed notwithstanding the arbitrator's adverse decision on his employment status. Brownlee directs us to the Court's pronouncement that "in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel effect to an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." *Id.* at 292, 104 S.Ct. at 1804.

First, we note that we are not applying the concepts of res judicata or collateral estoppel in deferring to the arbitrator's CBA and AA interpretation. But more importantly, *McDonald* does not apply here because the 1983 claim in that case was not dependent on any term in the collective bargaining agreement. The issue there was whether the arbitrator's determination that McDonald had been fired for just cause precluded a section 1983 claim alleging that McDonald was fired for exercising his First Amendment free speech rights. *Id.* at 286, 104 S.Ct. at 1800. In contrast to *Dykes* and this case, where the CBA and the constitutional provision turned on the same issue, the CBA in *McDonald* was not alleged to contain any provisions that intertwined with the First Amendment claim. *See Papapetropoulous v. Milwaukee Transport Servs., Inc.,* 795 F.2d 591, 597 (7th Cir.1986) (*McDonald* plaintiff "had a viable cause of action against [his] employer for conduct independent of the arbitrator's arbitration proceeding."); *McNair v. United States Postal Serv.,* 768 F.2d 730, 736–37 (5th Cir.1985) (*McDonald* "involv[ed] a claim of employer action that, without regard to the terms of the collective bargaining agreement, violates a federal statute. The claims did not derive in any way from contractual rights and the employee[ ], therefore, [was] not attacking the arbitrators' decisions or the arbitration process."). *McDonald* simply stands for the proposition that a section 1983 action is not barred by arbitration proceedings dealing with the same events.

*McDonald* is therefore distinguishable based on the independence of the issues presented to the arbitrator and the Court. In Brownlee's case, the arbitral determination and the property interest issue turned on the very same question—whether Brownlee attained career service status. Under these circumstances, giving credence to Brownlee's section 1983 claim would condone circumventing the required mechanism for reviewing an arbitrator's decision—an action in Illinois Circuit Court to vacate the arbitration award. *See* 5 ILCS 315/8, 315/16; 710 ILCS 5/12. The Seventh Circuit has held that *McDonald* does not permit such roundabout attempts to challenge arbitral determinations.

> The theory of *McDonald* ... is that in instituting an action under [the statutes], the employee is not seeking review of the arbitrator's decision. Rather, he is asserting a statutory right independent of the arbitration process. In the action before us Papapetropoulous has failed to assert any statutory right independent of the arbitration process; rather, he seeks nothing but a review of the arbitrator's decision under the guise of a section 1983 action.

*Id.* (internal quotations and citations omitted). We will not permit Brownlee to use section 1983 as a means of avoiding the tight constraints of judicial review:

> [T]he Court made clear almost 30 years ago that the courts play only a limited role when asked to review the decision of an arbitrator. The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards" United *Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 596, 80 S.Ct. 1358, 1360, 4 L.Ed.2d 1424 (1960).

*United Paperworkers Intern. Union v. Misco, Inc.*, 484 U.S. 29, 36, 108 S.Ct. 364, 369, 98 L.Ed.2d 286 (1987).

CONCLUSION

Because Brownlee has failed to demonstrate that he possesses a protected property interest in his job as an EMA, he cannot prove an essential element of his Fourteenth Amendment procedural due process claim. Accordingly, we grant the City's motion for summary judgment and deny Brownlee's cross-motion for summary judgment. Because we rule for the City on the issue of liability, there is no need for further discovery or briefing on damages. The Clerk of the Court is directed to enter judgment in the City's favor.