Ernestine ALI, Plaintiff,

v.

Jesse BROWN, Secretary, Department of Veteran Affairs, Defendant.

No. 96 C 7879.

United States District Court, N.D. Illinois, Eastern Division.

March 23, 1998.

Edmund Patrick Burke, Burke & Burke, Ltd., Chicago, IL, for Ernestine L. Ali.

Ernestine L. Ali, Forest Park, IL, pro se.

Jack Donatelli, Chicago, IL, for defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff Ernestine Ali worked for the Department of Veteran Affairs ("VA") as a medical clerk typist at the Veterans Affairs Hospital in Hines, Illinois from August 9, 1992 until October 31, 1994, when she was fired. In the termination letter, the VA pointed to Ali's year-long, unauthorized absence from work, her failure to request leave, and her unwillingness to obey supervisory instructions. Ali, however, challenged these articulated reasons, first, before the Merit Systems Protection Board ("MSPB"), second, before the EEOC, and now, in this Court. She claims in Count I of her complaint that her discharge was really motivated by disability, race, and religious discrimination, and was an act of retaliation for an earlier EEOC charge she had filed against a VA employee. In Count II, Ali seeks judicial review of the MSPB decision sustaining her termination. Before the Court is the VA's motion to dismiss or, in the alternative, for summary judgment on Count I, as well as the parties' cross-motions for summary judgment on Count II.

### RELEVANT FACTS[1]

Before Ali began working at Hines Hospital, she was a telephone operator for the VA. While in this position, Ali filed an EEOC complaint dated November 11, 1991 against her supervisor. She alleged that the supervisor's decision to place her on a rotated split work shift constituted race discrimination. (Def.'s Facts ¶ 1.) The dispute settled in June 1992 after the VA agreed to reassign Ali to the medical/clerk typist position at Edward J. Hines Hospital. (*Id.*) Ali began working as a medical clerk/typist at Hines on August 9, 1992, and remained there until stress and anxiety caused her to leave in November 1993. (Pl.'s Facts ¶ 2).

In December 1993, Ali filed for workman's compensation with the Department of Labor, claiming that "while at work I suffered with a nervous stomach, headachs [sic], my nerves were bad, and I had hair loss. Felt better once I was away from MAS [the VA's Medical Administration Service]. I was under stress from the actions of Mr. Soltys, Ms. DeSantis and M[s]. Lopez. Also the sexual harassment of Mr. Gilkey." Ali explained that she was afflicted with "major depression, single episode [and] severe general anxiety." (Def.'s Facts ¶ 4.)

The VA carried Ali on leave without pay status from November 29, 1993 to January 29, 1994, and granted her an extension to remain on leave without pay until February 28, 1994. (*Id.* ¶ 5.) But the VA wanted more information about Ali's medical condition. (*Id.* ¶ 6.) W.C. Soltys, the VA's Chief of Medical Administration Service, told Ali's supervisor, Mary Jo Lopez, that he would not approve Ali's future requests for leave without pay unless Ali's doctor began submitting monthly medical statements updating the VA on Ali's medical condition. (*Id.* ¶ 7.) Thus, on January 31, 1994, Lopez wrote Ali and explained that, to continue her leave without pay, she needed to provide medical information in the form of monthly updates, to complete a memorandum requesting leave without pay, and fill out a Form SF 71. (*Id.* ¶ 8.)

Receiving no response from Ali, Lopez notified her on February 24, 1994 that the VA was still missing the necessary medical documentation—and that Ali had been considered

---

1. The facts are derived primarily from the parties' 12(M) statements ("Pl.'s Facts" and "Def.'s Facts") and accompanying exhibits. Neither party submitted a response challenging its opponent's 12(M) statement; however, the facts in this case are essentially undisputed. Our review of the MSPB decision is also based on the administrative record.

AWOL ("Absent Without Leave") since January 31, 1994 as a result. (*Id.* ¶ 9.) Lopez instructed Ali either to submit the required medical documentation and another request for leave without pay, or to return to work. She warned Ali that AWOL charges can lead to disciplinary action. (*Id.*)

Ali responded by submitting a physician's statement covering the period November 26, 1993 through March 15, 1994, but did not include a request for leave without pay or a completed SF 71. (*Id.* ¶ 10.) Lopez wrote Ali on April 4, 1994, reiterating the documentation that Ali needed to submit to maintain leave without pay status. (*Id.* & Ex. 4X.) She told Ali that she would be carried on AWOL status until the VA received the required documentation. (*Id.*)

On May 3, 1994, Ali finally submitted her request for leave without pay for the period March 16, 1994 through May 1, 1994. (*Id.* ¶ 11.) Lopez sent Ali a letter on May 11, 1994 explaining that her past documentation was insufficient. The letter outlined what was required: a medical history of Ali's condition, clinical findings from Ali's most recent medical evaluation, an assessment of Ali's current health status, the doctor's diagnosis and prognosis, a memorandum requesting leave without pay, and a completed SF 71. (*Id.* Ex. 4V.) Lopez enclosed a description of Ali's position and its performance standards to "better enable your physician to respond to the requested information." (*Id.*) Lopez reminded Ali that she had been carried on AWOL status since March 1, 1994. She warned Ali that she could be disciplined if she failed to provide documentation excusing her post-March 1 absence within ten days. (*Id.*)

Ali's husband, Hasan Ali, called the VA on May 31, 1994 to request more time to respond. (Def.'s Facts ¶ 13.) He wrote the VA a letter to the same effect, explaining that his wife's doctor was on vacation and would provide the requested information "as soon as possible" after she returned. (*Id.* Ex. 4S–T.) He enclosed a completed SF 71 for the period April 16, 1994 through May 31,

1994 and a note that Ali's doctor, Sharon Lieteau, had written on a prescription pad:

> To whom it may concern: Ernestine Ali is totally disabled and at the present time, I am unable to give a date to return to work. I will return paperwork as soon as possible.

(*Id.* Ex. 4R.)

On June 14, 1994, Lopez sent Ali a letter by certified mail seeking a completed SF 71 and a memorandum requesting leave from March 1, 1994 through June 30, 1994, noting that "I have received periodic SF 71s from you but none of them cover[s] this complete period of time." Lopez also asked Ali to file medical documentation, SF 71s and memos requesting leave for any future period of absence. (*Id.* ¶ 15 & Ex. 4Q.) She informed Ali that all these documents had to be submitted monthly, and enclosed SF 71s and memoranda for Ali to complete and return. (*Id.*) When she did not hear from Ali, Lopez wrote Chief Medical Administrator Soltys on July 11, 1994, recommending that he deny Ali leave without pay and deem her AWOL for ignoring Lopez's repeated, detailed, instructions. (*Id.* ¶ 16 & Ex. 4P.)

On August 12, 1994, Lopez notified Ali that her sporadically filed medical documentation and leave requests neglected large periods of time, including March 1, 1994 through April 15, 1994; June 1, 1994 through June 30, 1994; and July 31, 1994 until the present. (*Id.* ¶ 17.) Lopez directed Ali either to provide the missing information by the close of business on August 26, 1994, or face AWOL charges and appropriate disciplinary action, including possible removal. (*Id.*)

Having received neither documentation nor explanation from Ali, Chief Medical Administrator Soltys sent her a Proposed Removal Notice on September 28, 1994. (*Id.* ¶ 18.) Soltys identified three charges prompting Ali's proposed removal: AWOL, failure to follow proper leave requesting procedures, and deliberate failure to carry out supervisory directions.[2] (*Id.*) He also explained these charges, emphasized her rights to contest them and review the evidence, identified the time in which and the person to

---

**2.** The VA provides its employees with a "Table of Examples of Offenses and Penalties," which lists

the range of discipline that the VA may impose for assorted employee misconduct.

whom she had to respond, and delineated her rights to representation, to a written decision, and to file for disability retirement. (*Id.*) Ali responded to the proposed removal on October 5. She requested annual leave in lieu of sick leave, insisted that she had tried to comply with supervisory instructions, and declared that she "would like to return to work but not under that same stressful working environment which is causing most of her stress." (*Id.*)

In addition, Dr. Sharon Lieteau wrote the VA on October 12, 1994. She diagnosed Ali with "Major Depression Single Episode Moderately Severe" and characterized her prognosis as "guarded." (*Id.* ¶ 20.) Dr. Lieteau explained that Ali had become emotionally unable to tolerate her work environment because of a clear difference in treatment between her and her peers. Particularly disturbing to Ali was her designation as the solitary evening shift worker. Ali believed she was not included in the determination process because she was black and had a history of filing EEO complaints,[3] and told the doctor she was uncomfortable working with peers who had unilaterally selected her to work this shift. (*Id.*) This event so troubled Ali that she began having trouble sleeping, was irritable with her husband, and would vomit every Sunday, anticipating the workweek. (*Id.*) According to Ali's doctor, "this incident set the tone for her experience in her office"; she opined that things deteriorated still more after the VA transferred Ali to another section. (*Id.*)

On October 25, 1994, Soltys wrote Dr. Lieteau and asked her to name an "expected" date for Ali's return. (*Id.* ¶ 21.) Soltys also informed the doctor that Ali had not been to work since November 1993, and that Ali's version of events—as recited in Dr. Lieteau's letter—was "less than factual." (*Id.*) According to Soltys, Ali interpreted efforts to work with her on attendance as harassment. (*Id.*) Dr. Lieteau responded that Ali could return to work by November 1, 1994, but only if given a new work assignment. Resuming her old position would cause a relapse. (*Id.* ¶ 22.)

Soltys recorded a "Report of Contact" on October 28, 1994, noting that the VA could not accommodate Ali in a different position. (*Id.* ¶ 23.) He wrote that "[a]ll positions are comparable to and as demanding as the Clinic Clerk position she is assigned, or other positions require specialized experience or education that Ms. Ali presently does not meet [sic]." (Def.'s Facts Ex. 4G.) Soltys stated that he had spoken with the VA's Director and Associate Director, who concurred that the VA could not accommodate Ali and should proceed with her removal. (*Id.*)

On October 31, 1994, the VA's Associate Director sent Ali a removal decision letter terminating her employment effective November 4, 1994. (Def.'s Facts ¶¶ 24–25.) The decision rested on the three grounds identified in Ali's proposed removal letter: (1) her long, unauthorized absence (AWOL); (2) her repeated failure to follow proper leave procedures, and (3) her frequent and deliberate failure to carry out supervisory directions. (*Id.* ¶ 26.) The letter went on to explain Ali's appeal rights. (Def.'s Facts Ex. 4C.)

As was her right, Ali appealed the VA's decision to the Merit Systems Protection Board ("MSPB"), alleging that her removal was the result of religious, racial, marital status, and disability discrimination, and was illegal reprisal for former EEO activity. (*Id.* ¶ 28.) On March 10, 1995, the MSPB ruled on Ali's appeal in favor of the VA. (*Id.* ¶ 29.) After carefully chronicling the series of events and correspondence between November 1993 and September 28, 1994, the MSPB concluded that "[t]he agency's denial of [Ali's] request for leave without pay was reasonable under all the circumstances of this case," and that "the agency ha[s] established that [Ali's] absence from March 1, 1994, through September 28, 1994, was unauthorized." (*Id.* at 2–5, 8.)

The MSPB explained that when an agency denies an employee leave without pay—and the denial later provides the basis for an adverse employment action—the agency's

---

**3.** There is no evidence to support that Ali had a "history" of filing EEOC complaints. The record shows that she filed only one complaint—in November 1991—during her tenure with the VA.

leave determination is reviewed for reasonableness. (*Id.* at 5) (citing *Fisher v. Department of Defense*, 54 M.S.P.R. 675, 683 (1992)). In particular, the MSPB noted, "it is reasonable for an agency to deny an employee LWOP [leave without pay] where the employee has failed to return to work or to submit medical evidence to justify the absence after having been directed to do so and warned that failure to do so could result in discipline." (*Id.* at 6) (citing *Fisher*, 54 M.S.P.R. at 683). The MSPB held that the VA had proven its charges by a preponderance of the evidence, and held that the VA's decision to deny Ali's LWOP request was reasonable under the circumstances. (*Id.*)

First, Ali's medical documentation was insufficient. It "failed to explain how her condition was disabling, omitted her diagnosis and prognosis (until after the agency proposed her removal), and provided no foreseeable end to the appellant's absence." (*Id.*) Dr. Lieteau's October 12, 1994 medical report also ignored the questions outlined in the VA's May 11, 1994 letter to Ali, listing only a conclusory diagnosis unsupported by clinical findings. (*Id.*) The MSPB rejected Ali's contention that "it was improper for the agency to require her to identify her medical condition," explaining an agency can require such information when an employee requests extended periods of leave based on illness. (*Id.* at 7) (citing 5 C.F.R. § 630.403 (1994) (sick leave may be granted only when supported by administratively acceptable evidence)).

Second, the MSPB found that Ali had disregarded the agency's leave-requesting procedures and deliberately ignored her supervisor's instructions. (*Id.*) It pointed to Lopez's letters telling Ali exactly what documents to submit and when. In response, the MSPB noted, Ali submitted several late SF–71 leave requests and some "conclusory" memoranda from her doctor—submissions that did not comply with the VA's instructions. (*Id.* at 7–8.) Significantly, Ali was warned several times that withholding this information could precipitate AWOL charges, disciplinary action, and removal. (*Id.* at 8.)

The Board saw no merit in Ali's argument that the VA improperly removed her while she was ill. Ali had no sick leave available, and the MSPB explained that the VA has discretion to charge an employee with AWOL in lieu of granting leave without pay, even when it has acceptable medical evidence of illness. (*Id.*) (citing *Riley v. Department of Army*, 53 M.S.P.R. 683, 689 n. 4 (1992)). Ali also urged that "she should have been allowed to use annual leave," but the MSPB pointed out that she had only 18 hours of annual leave available as of March 1, 1994, leaving her AWOL for a significant time period. (*Id.*)

As affirmative defenses, Ali raised her discrimination and retaliation claims. The MSPB found each of them wanting. (*Id.* at 9–11).

In support of her claim for religious discrimination, Ali alleged that "Ms. Lopez did not like [Ali's] Moslem name and delayed [her] receipt of a badge." (*Id.* at 9.) The MSPB explained that these bare allegations, unsupported by any evidence, were insufficient to propel her religious discrimination claim. Assuming the allegations were true, they would constitute direct evidence of discrimination. But Ali's claim would still fail because the agency had ample nondiscriminatory grounds to remove her—therefore, Ali could not show that religion was a "substantial factor" in the agency's termination decision. (*Id.*) (citing *Johnson v. Defense Logistics Agency*, 61 M.S.P.R. 601, 604 (1994)). Likewise, the MSPB found no evidence to support a religious disparate treatment claim. (*Id.*)

Ali's race discrimination claim alleged that, contrary to her experience, white employees were not continually required to provide medical documentation when requesting leave because of illness or injury. (*Id.*) This claim failed as well because Ali "has not identified the white employees, has not presented any evidence that they had extended, open-ended, and undocumented absences similar to [Ali's] or that they worked for Ms. Lopez." (*Id.* at 10.) Absent appropriate comparables, Ali could not show a discriminatory difference in treatment. (*Id.* at 9–10.)

Ali also failed to present any evidence supporting her allegation of marital status

discrimination; as a result, the MSPB dismissed this claim. (*Id.* at 11.) Ali's disability discrimination claim suffered the same fate because Ali did not establish that she was disabled as defined by the Rehabilitation Act. (*Id.*)

Ali's last affirmative defense was that her removal was retaliation for filing the November 11, 1991 EEO complaint against her male supervisor for sexual harassment. (*Id.*) Although the MSPB determined that filing an EEO complaint constitutes "protected activity," it found that the complaint could not have precipitated her removal because the events were separated by over two years' time. (*Id.* at 12.) Consequently, Ali failed to forge the necessary causal link between the EEO complaint and her removal. (*Id.*)

Ali appealed the MSPB's decision to the EEOC. Reviewing de novo only the MSPB's determination of Ali's discrimination and reprisal claims, the EEOC affirmed. (EEOC decision at 5.) The Commission found that Ali failed to establish that the VA's proffered nondiscriminatory reasons for its actions were a pretext for race or religious discrimination [4]:

> The record supports the agency's contention that [Ali] failed to comply with the agency's May 11, 1994 request that she submit detailed medical information in support of her request for LWOP and her continuing absence. Rather, [Ali] submitted brief, conclusory, and inadequate statements from [Dr. Lieteau] indicating only that she remained under the doctor's care and unable to work. We find nothing improper with the agency's request for more detailed information from [Ali] relative to her prolonged absence from the workplace. We further find nothing in the record to support [Ali's] contention that the agency removed her for reasons relating to her race or religion, that it treated similarly situated white employees more favorably, or that her supervisor became hostile after

[Ali] married and took her husband's name.

(EEOC Decision at 6.) As for Ali's disability and reprisal claims, the EEOC concurred with the MSPB's conclusions that Ali did not meet Rehabilitation Act's "disability" definition, and that she failed to show the required link between her removal and her EEO filing over two years earlier. (*Id.* at 7–8).

A month after the EEOC handed down its decision, Ali filed a two-count complaint in this Court. Count I alleges employment discrimination arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2; the Civil Rights Enforcement Statutes, 42 U.S.C. §§ 1981, 1983; and the Americans with Disabilities Act, 42 U.S.C. § 12112, based upon Ali's race, religion, and disability.[5] Count II requests judicial review of the MSPB's decision [6] under 5 U.S.C. § 7703. The VA has filed a motion to dismiss or, in the alternative, for summary judgment on Count I, and the parties have submitted cross motions for summary judgment on Count II. In light of the fact that both sides rely on documents outside the pleadings, the Court will evaluate Count I under Rule 56(c) summary judgment standards instead of Rule 12(b)(6) pleading standards. *See* FED. R.CIV.P. 12(b).

### *SUMMARY JUDGMENT STANDARDS*

Summary judgment is proper when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.,* 40 F.3d 146, 150 (7th Cir.1994). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all the evidence in a light most favorable to the nonmoving party, and draw all reasonable inferences from the evidence in the non-

---

4. The EEOC stated, without explanation, that it lacked jurisdiction to hear Ali's marital status discrimination claim. (EEOC decision at 1 n. 1.)

5. The complaint's jurisdictional statement curiously includes a citation to the Age Discrimination in Employment Act, 29 U.S.C. § 626(c). Because Ali has neither alleged nor argued age

discrimination, either in the administrative proceedings below or in this Court, we have no basis for assessing such a claim.

6. We have not been asked to review the EEOC's decision affirming the MSPB.

924

movant's favor. *Cincinnati Ins.*, 40 F.3d at 150. But if the evidence is merely colorable, or is not significantly probative, or just raises "some metaphysical doubt as to the material facts," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 261; *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court's sole function is to decide whether sufficient evidence exists to support a verdict in the nonmovant's favor—a standard that applies with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir.1993).

When the parties submit cross-motions for summary judgment, the court is not required to grant judgment as a matter of law to one side or the other. *Heublein Inc., v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993). The court must evaluate each party's motion on its own merits, resolving factual uncertainties and drawing all reasonable inferences against the party whose motion is under consideration. *Id; Buttitta v. City of Chicago*, 803 F.Supp. 213, 217 (N.D.Ill.1992), *aff'd*, 9 F.3d 1198 (7th Cir.1993).

## ANALYSIS

### I. Count I

■ Most of Count I can be disposed of summarily. Ali's complaint indicates that she has suffered discrimination on the basis of several protected characteristics,[7] but she pursues only Title VII race discrimination in her brief. Her failure to support the remaining claims with legal argument or authority waives them. *See Reidt v. County of Trempealeau*, 975 F.2d 1336, 1341 (7th Cir.1992) (plaintiff waived disparate impact claim alleged in complaint because she did not fulfill her "minimal responsibility of identifying the applicable law and arguing why the facts ... fit into the parameters of that law."); *see also Freeman United Coal Mining Co. v. Office of Workers' Compensation Programs*, 957 F.2d 302, 305 (7th Cir.1992) ("[W]e have no obligation to consider an issue that is ... not developed [ ] in a party's brief."). Indeed, Ali goes so far as to abandon explicitly her Title VII retaliation, disability discrimination, and §§ 1981 and 1983 claims, conceding that "it does not appear that [she] will be pursuing these areas at trial but limiting [sic] [her] claim under Count I" to race discrimination under Title VII. (Pl.'s Resp.Br. at 3–4).

■ Even in the absence of Ali's concession, we find that she offers no proof to substantiate retaliation,[8] disability discrimination,[9] or religious discrimination.[10] Ali cannot defeat summary judgment through "self-serving assertions without factual sup-

---

7. The pleading contains only the barest of allegations, requiring this Court to discern Ali's claims for relief from the MSPB and EEOC decisions attached to the complaint.

8. Ali simply asserts, by reference to the administrative decisions below, that the VA fired her in retaliation for filing an EEO complaint against her former supervisor. To establish a prima facie case for retaliation, however, Ali must show a causal connection between "protected activity" (here, filing the EEOC charge on 11/11/91) and an adverse employment action (here, termination in 10/94). *See Rennie v. Dalton*, 3 F.3d 1100, 1109 (7th Cir.1993). "In order to demonstrate the 'causal link,' the plaintiff *must* demonstrate that the employer would not have taken the adverse action 'but for' the protected expression." *Johnson v. University of Wisconsin–Eau Claire*, 70 F.3d 469, 479 (7th Cir.1995). Ali's submissions are devoid of proof that she would not have been removed "but for" filing an EEO complaint, or that these events were connected in any way; moreover, the nearly three-year period separating Ali's EEO complaint and her termination belies the requisite nexus. *See Johnson*, 70 F.3d at 480 (20–month lapse between protected expression and adverse action is "counter-evidence" of any causal connection).

9. As a threshold matter, disability discrimination claims *against the federal government arise* under the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, not the ADA. *See* 42 U.S.C. § 12111(5)(B)(i) ("The term 'employer' does not include the United States....") The two statutes do, however, apply the same legal standards. *See* 29 U.S.C. § 791(g) ("The standards used to determine whether this section has been violated in a complaint alleging nonaffirmative action employment discrimination under this section shall be the standards applied under Title I of the Americans with Disabilities Act of 1990...."). Ali claims she is disabled due to "major depression." However, she does not provide any evidence that: 1) her mental illness substantially limits major life activities; 2) she has a history of an impairment that so limits her; or 3) she is regarded as having such an impairment. A

port in the record." *Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir.1994) (internal quotations and citation omitted). Moreover, "a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered...." *Reklau v. Merchants Nat'l Corp.*, 808 F.2d 628, 629 n. 4 (7th Cir.1986). Because Ali fails to provide any evidence or argument to support her discrimination claims based on disability, religion, retaliation, and 42 U.S.C. §§ 1981 and 1983, we enter summary judgment on these claims in favor of the VA.

Turning to Ali's race discrimination claim under Title VII, she argues that the VA discriminated against her in favor of white employees, who, in contrast to Ali, were not required to submit detailed medical information when requesting leave without pay. This claim cannot survive summary judgment, however, because (1) it is not backed by specific evidentiary facts, and (2) Ali presents no evidence that requiring this documentation was a pretext for race discrimination.

To defeat the VA's motion for summary judgment, Ali must establish that she was a victim of intentional race discrimination, using either direct or circumstantial proof. Ali offers no direct evidence of intentional discrimination; instead, she opts for the indirect, burden-shifting method of circumstantial proof articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, Ali argues that this Court must infer discrimination from her conclusory assertion that she was treated less favorably than white employees. We disagree.

To prevail under *McDonnell Douglas*, Ali must first establish a prima facie case of discrimination through the following elements: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action, *e.g.*, discharge; and (4) she has evidence from which it can be inferred that the adverse action sprang from a "legally forbidden ground," for example, more favorable treatment of similarly situated white employees. *See Carson v. Bethlehem Steel Corp.*, 82 F.3d 157, 158–59 (7th Cir.1996); her employer treated similarly situated white employees more favorably, *see also Lenoir v. Roll Coater, Inc.*, 13 F.3d 1130, 1132 (7th Cir.1994). Once established, the prima facie case creates a rebuttable presumption of discrimination. The burden of production then shifts to the employer to produce evidence of a legitimate, non-discriminatory reason for the discharge. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the employer carries its burden, the presumption of discrimination disappears and plaintiff must show that the employer's proffered reason for the discharge is merely a pretext for intentional discrimination. *Id.* Although the burden of production shifts throughout the analysis, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

[3] Ali's race discrimination claim fails at the prima facie case stage because she has not presented any evidence to support the fourth element—a racial disparity in treatment. "[T]he prima facie case requires evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion," *Leffel v. Valley Fin. Servs.*, 113 F.3d 787, 792 (7th Cir.)

---

plaintiff must prove at least one of these points to substantiate an ADA claim. *See Palmer v. Circuit Court of Cook County, Social Service Dept.*, 905 F.Supp. 499, 507 (N.D.Ill.1995) (citing 42 U.S.C. § 12102), *aff'd*, 117 F.3d 351 (7th Cir.1997), *cert. denied*, — U.S. ——, 118 S.Ct. 893, 139 L.Ed.2d 879 (1998).

**10.** Ali's complaint simply lists "religion" as a basis of discrimination without any supporting allegations. Assuming Ali's religious discrimination claim mirrors what she alleged in the administrative proceedings—that supervisor Lopez denied Ali a badge because she disliked Ali's Moslem surname—the claim cannot withstand summary judgment because Ali presents no evidence that Lopez resented Ali's last name, or denied Ali a badge for that or any other reason.

(internal quotations and citations omitted), *cert. denied*, —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997); "bare assertions" without evidentiary support cannot create a genuine issue of material fact, *see Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 708 (7th Cir.1995). Ali does no more than allege that white VA employees on leave were neither asked for as much medical documentation as she, nor fired for failing to provide it. Ali identifies no white employees who took an extended period of leave similar to hers, much less white employees working for Lopez who took leave and were granted a reprieve from submitting the kinds of corroborating medical documentation that Ali was required to file. Simply put, Ali "must present affirmative evidence ... and may not rest upon allegations or denials of the pleading." *Valentine v. Joliet Township High Sch. Dist. No. 204*, 802 F.2d 981, 986 (7th Cir.1986) (internal quotations and citation omitted). Ali, however, has failed to present any evidence that white employees (or any other employees, for that matter) in her situation were treated more favorably.

■ Even if we assumed that Ali met her initial *McDonnell Douglas* burden, summary judgment is in order because Ali cannot show that the VA's nondiscriminatory reason for terminating her was a pretext for race discrimination. The VA provides three nondiscriminatory justifications for terminating Ali's employment: (1) AWOL, (2) her failure to follow proper leave requesting procedures, and (3) her deliberate failure to carry out supervisory instructions on numerous occasions. Because the VA has produced evidence, through the parties' yearlong correspondence, to support these nondiscriminatory reasons for terminating Ali's employment, the burden shifts to Ali, to "move beyond the pleadings and ... set forth specific facts from which it might reasonably be inferred" that invoking these policies in Ali's case was merely a pretext for discrimination. *Wooten v. Acme Steel Co.*,

986 F.Supp. 524, 533–34 (N.D.Ill.1997) (internal quotations and citations omitted); *cf. Jenkins v. Heintz*, 124 F.3d 824, 831 (7th Cir.1997). Ali may show pretext by demonstrating that (1) the VA's reasons have no basis in fact, (2) they did not actually motivate her removal, or (3) they are insufficient to warrant removal. *See Collier v. Budd Co.*, 66 F.3d 886, 892 (7th Cir.1995).

Ali takes the third approach. She claims that the VA's "Table of Examples of Offenses and Penalties," a guide to determining the range of appropriate discipline for listed employee "offenses," does not permit termination as punishment for her alleged misconduct. Specifically, Ali claims that she committed only one listed "offense"—a single unexcused absence (albeit one that lasted eleven months)—which the VA impermissibly stretched into three offenses. According to Ali, the guidelines do not permit termination for a lone unexcused absence. As such, she claims, "there is a possibility that such an action was merely a pretext for discrimination." (Pl.'s Resp. Br. at 5.) This argument lacks merit.

The VA's "Table Of Examples Of Offenses And Penalties: Range Of Penalties For Stated Offenses" ("Table") lists three separate offenses that easily encompass the VA's stated reasons for terminating Ali: (1) AWOL is an "unexcused or unauthorized absence"; (2) Ali's failure to follow proper leave requesting procedures constitutes "deliberate failure or unreasonable delay in carrying out instructions"; and (3) Ali's deliberate failure to obey Lopez's directions is a "deliberate refusal to carry out any proper order from ... immediate or other supervisor." (Pl.'s Resp. Br. Ex. C (Table)). The Table contemplates discrete disciplinary actions for each of these offenses, and each comes with its own range of suggested penalties—including, in each case, a maximum penalty of removal for the third transgression:

| Nature of Offense | 1st Offense Minimum Maximum | 2nd Offense Minimum Maximum | 3rd Offense Minimum Maximum |
|---|---|---|---|
| 2. Unexcused or unauthorized absence | Admonishment Reprimand | Reprimand 10 days | 10 days Removal |
| 12. Deliberate failure or unreasonalbe delay in carrying out instructions | Admonishment Reprimand | 3 days 10 days | 10 days Removal |
| 17. Deliberate refusal to carry out any proper order from ... immediate or other supervisor ... | Reprimand Removal | 10 days Removal | Removal |

(Pl.'s Resp. Br. Ex. C (Table)).

The Table, however, does not truss the VA in shackles. The "Instructions for Use of the Table of Violations," provided to VA employees, explains that "the range of penalties indicated in this table is to be used as a *guide* in administering discipline...." (*Id.* ¶ 1.) (emphasis in original). Thus, it need not be followed to the letter. The instructions explicitly permit imposing penalties greater than those listed "[w]hen an employee has committed a combination or series of offenses ...," *id.* ¶ 3(d), and states although "disciplinary penalties will generally fall between the ranges indicated in the guide, in unusual circumstances greater or lesser penalties may be imposed." *Id.* ¶ 3(f). Significantly, the VA may impose progressive discipline for unrelated offenses: "For example, an employee who has received an admonishment for AWOL can receive a reprimand for sleeping on duty, and possibly be suspended or removed for a third offense unrelated to the two previous infractions." *Id.* ¶ 3(c). Removal may be administered if warranted under the circumstances, *id.* ¶ 3(g), in recognition of the fact that the Table "is not an intended to be an exhaustive listing of all offenses." *Id.* ¶ 3(a). Consequently, the guidelines make clear that the VA has considerable discretion in determining appropriate punishment for employee misconduct.

The undisputed facts show that Ali's removal was well within the VA's discretion. Her misconduct not only fits three separate offenses, she committed each offense numerous times. The parties' correspondence reveals that supervisor Lopez repeatedly asked Ali to submit memoranda requesting leave, to complete SF 71s, and submit detailed medical documentation from her physician on a monthly basis. In addition, Lopez told Ali no less than three times that the VA considered her AWOL as of March 1, 1994. The Table does not specify how to calculate unauthorized absences—presumably the VA could consider each day Ali was absent without proper documentation to be a separate, punishable unauthorized absence. In any event, the guidelines make clear that the VA may impose progressive sanctions for unrelated offenses—a process that, applied to Ali, explicitly authorizes her removal. Finally, even if the Table did not specifically encompass Ali's offenses, the VA had the discretion to remove her if "warranted by the facts" in her case. (Pl.'s Ex. C ¶ 3(g)). Since the undisputed evidence casts no doubt on the veracity, legitimacy, or sufficiency of the VA's stated reasons for terminating Ali, she has not met her burden of demonstrating pretext. *See Collier,* 66 F.3d at 892.

In sum, we conclude that Ali has failed to set forth specific facts from which a fact finder may reasonably infer that the VA discriminated against her on the basis of race. Accordingly, Count I fails as a matter of law.

## II. Count II

In Count II, Ali seeks review of the MSPB decision affirming her discharge. Normally, the Court of Appeals for the Federal Circuit has sole jurisdiction to hear appeals from the Board. *See* 5 U.S.C. § 7703(b)(1). But "mixed" cases, which both challenge the MSPB's decision affirming an adverse job action and present employment discrimination claims, may be brought in an appropriate federal district court. *Afifi v. United States Dep't of Interior,* 924 F.2d 61, 62–63 (4th Cir.1991) (citing 5 U.S.C. § 7703(b)(2)); *see Randle v. Bentsen,* 19 F.3d 371, 374 (7th Cir.1994).

Citing the Seventh Circuit's decision in *Randle v. Bentsen,* the VA nonetheless suggests that our disposal of Ali's discrimination claims robs us of jurisdiction to review the MSPB's personnel action determination. But a careful reading of *Randle* undermines the VA's assertion. The court specifically declined to decide whether a district court presented with a "mixed" case may retain jurisdiction after dismissing the discrimination claims, "or whether jurisdiction then resides exclusively in the Federal Circuit ." *Randle,* 19 F.3d at 374 n. 2. *Randle* points to the "Fourth Circuit's decision in *Afifi* as guidance for future litigants facing this question." *Id.*

*Afifi* supports retaining jurisdiction in this case. It gives district courts a choice: "[w]here the plaintiffs discrimination claim is not brought as a jurisdictional charade [11] but nonetheless quickly evaporates, we leave to the district court's discretion one of two alternatives—(1) retain jurisdiction over the nondiscrimination claim, or (2) transfer the case to the Federal Circuit under 28 U.S.C. § 1631." 924 F.2d at 64. The court emphasized the importance of judicial economy to this decision:

> How should district courts exercise this discretion? A fundamental consideration is the purpose of district court jurisdiction over mixed cases in the first place—judicial economy. This purpose is strikingly similar to the rationale for district court jurisdiction over state-law pendent claims. Accordingly, we find much guidance in the factors commonly considered by federal courts when deciding whether to retain jurisdiction over pendent claims where the federal claims have been dismissed—judicial economy, convenience, concerns for federalism, and fairness to litigants.

*Id.* With these objectives in mind, the Court finds it appropriate to exercise jurisdiction to review the MSPB's decision affirming the VA's personnel action.

Transferring this case to the Federal Circuit would not only waste the resources we have already committed to the case, it would also spawn duplicative efforts in the Federal Circuit. That court explained it best: "to split the discrimination and non-discrimination claims, which are closely related both logically and as a factual matter, would result in a tremendous waste of judicial resources while the district court and the court of appeals twice consider identical issues." *Williams v. Department of Army,* 715 F.2d 1485, 1490 (Fed.Cir.1983). The Title VII pretext analysis—that is, determining whether Ali cast doubt on the legitimacy of the VA's reasons for removal—overlaps to a large extent with whether the MSPB properly sustained those reasons for Ali's removal. We spent considerable resources in addressing de novo the propriety of removal in the discrimination context; we will expend scant more if we retain jurisdiction to review it in the appellate context, where our inquiry is much less searching. *See Mirza v. Department of Treasury,* 875 F.Supp. 513, 521 (N.D.Ill.1995) ("When considering a 'mixed' case, a federal district court reviews the discrimination claim de novo, and the nondiscrimination claim on the administrative record."). Moreover, it makes little sense to dismiss the removal action claim at this point only to have the Court of Appeals consider a factual scenario that has already been reviewed by the MSPB, the EEOC, and this Court. Finally, transfer will unfairly prejudice Ali, who would be left only with "a long-expired appeal ... to the Federal Circuit." *Afifi,* 924 F.2d at 63; *see* 5 U.S.C. § 7703(b)(1) (petition for review must be filed within 30 days after receiving notice of MSPB's final decision). We will thus proceed to review the MSPB's decision sustaining Ali's removal.

■ This Court must affirm the MSPB's decision unless it was (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; (2) reached without following procedures required by law, rule or regulation; or (3) unsupported by substantial evidence. *See* 5 U.S.C. § 7703(c).

---

11. The VA does not argue that Ali used her discrimination claims to create false jurisdiction, nor does the record support this conclusion. Ali pursued her discrimination claims throughout the administrative process; she did not simply tack them onto her complaint for the first time in this Court.

Ali argues only the first—that the MSPB's decision was arbitrary, capricious and an abuse of discretion. The arbitrary/capricious standard of review requires that the agency decision have a rational basis in the law. *Hurley v. United States,* 575 F.2d 792, 794 (10th Cir.1978). It is a more lenient standard, for example, than the substantial evidence test. Substantial evidence "must do more than create a suspicion of the existence of the fact to be established ... and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939). Conversely, " 'an agency determination must [only] have some evidentiary basis to avoid being held arbitrary and capricious.' " KENNETH C. DAVIS & PIERCE RICHARDS, JR., ADMINISTRATIVE LAW TREATISE 202 (3d ed.1994) (quoting *Aman v. FAA,* 856 F.2d 946, 950 n. 3 (7th Cir.1988)). We must therefore ask whether the MSPB decision upholding Ali's termination has some evidentiary support and a rational basis in the law.

The MSPB began its opinion by setting forth the legal standards—articulated in *Fisher v. Department of Defense,* 54 M.S.P.R. 675, 679–83 (1992)—governing agency removal based on the denial of leave without pay. First, it pointed out that the agency's denial of LWOP status must be "reasonable." (MSPB Decision at 5.) In particular, "[w]here an agency denies an employee leave without pay because of allegedly inadequate medical documentation, the Board will examine the record as a whole to determine if the denial was reasonable under the circumstances." (*Id.* at 5–6.) The MSPB explained that "[i]t is reasonable for an agency to deny an employee LWOP where the employee has failed to return to work or to submit medical evidence to justify the absence after having been directed to do so and warned that failure to do so could result in discipline." (*Id.*)

After thoroughly examining the parties' lengthy correspondence, the MSPB found that Ali's medical documentation was insufficient to justify her absence, that Ali had

failed to follow proper leave procedures, had disobeyed her supervisor's direct orders, and had been duly warned that these actions could result in her removal. First, the MSPB found that Ali's medical documentation "failed to explain how her condition was disabling, omitted her diagnosis and prognosis (until after the agency proposed her removal), and provided no foreseeable end to the appellant's absence." (*Id.* at 6.) Second, the Board determined that Ali had been told repeatedly, beginning in January 1994, that she had to complete memoranda requesting leave and SF 71s, but deliberately ignored these instructions and filed only "belated" SF 71s and "conclusory" memoranda from her doctor. (*Id.* at 7–8.) Finally, the MSPB emphasized that Ali had been warned several times that withholding this information could lead to AWOL charges and disciplinary action. (*Id.* at 8).

The MSPB then concluded that the VA's denial of Ali's LWOP request was "reasonable under all the circumstances of this case":

The appellant did not return to work and her absence remained open-ended. She failed to present evidence to support her leave request after being directed to do so and being warned [that] the failure to do so could lead to discipline. Accordingly, the agency has established by preponderant evidence that the appellant's absence from March 1, 1994, through September 28, 1994, was unauthorized. The agency has also established that it provided the appellant with numerous warnings about the information required from her and her doctor and that the appellant failed to provide the information.

(*Id.* at 8) (citations omitted).

We conclude that this decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" because it has a rational basis in the law and contains at least some—if not ample—evidentiary support. The MSPB's opinion centers on the governing legal principle that an agency may terminate an employee who takes leave, and fails either to return or submit medical evidence to justify the absence after she is both told to do so and warned of the

consequences. The evidence shows that this occurred in Ali's case.

To begin with, the record reveals that Ali's medical documentation did not support her requests for leave without pay. She provided nothing excusing her absence for seven months. In June 1994, her doctor finally sent the VA a note on a prescription pad with the conclusory statements that "Ali is totally disabled" and that the doctor could not predict a return date. The doctor presented no diagnosis, no information about Ali's disability, and no prognosis for recovery. Despite the VA's persistent attempts to obtain medical information substantiating Ali's disability, including a letter detailing the precise information the VA sought, the VA did not receive any more medical information until four months later, after Chief Medical Administrator Soltys proposed Ali's removal. Even this letter from Ali's doctor envisioned no end to Ali's absence.

The evidence also establishes that Ali failed to follow proper leave-requesting procedures, deliberately ignored her supervisor's instructions, and was fairly warned about the consequences. The record reveals the VA's herculean, nine-month effort, with letters every few weeks, to explain to Ali the procedural requirements for requesting leave without pay, and to obtain that documentation from her. Lopez even sent Ali the necessary forms. But Ali delayed in responding, and when she did, submitted forms that did not account for large periods of time. She was aware of this, because the VA wrote Ali to inform her that it had "received periodic SF 71s from you but none of them cover th[e] complete period of time." Ali was also told numerous times that the VA considered her AWOL, and that AWOL can lead to disciplinary action, including removal.

Finally, we cannot conclude that removal was an unreasonable or irrational response to Ali's actions. She was absent for nearly a year, never returned to work in the interim, and did not explain why—until the VA proposed her removal in September 1994. Even after she explained her absence, she did not provide an expected date for a return. The

MSPB could rationally have determined that the VA was reasonable to think that simply reprimanding or temporarily suspending Ali when she was already absent for several months without authorization would not likely have prompted her to return or comply with leave procedures. Since AWOL is a serious charge, we cannot say that it was irrational to conclude that any disciplinary measures short of removal were inadequate. *See Davis v. Veterans Admin.*, 792 F.2d 1111, 1113 (Fed.Cir.1986) (characterizing an eight-day AWOL as "serious" and warranting removal when combined with past disciplinary record).

In short, the evidence supports the MSPB's finding that the VA established both Ali's offenses and the reasons they warranted removal.[12] *See Davis*, 792 F.2d at 1113 ("The penalty assessed for employee misconduct is a matter of the exercise of the sound discretion of an agency in light of all relevant factors, mitigating and otherwise."); *Douglas v. Veterans Administration*, 5 MSPB 313, 324–25, 5 M.S.P.R. 280 (1981) (agency has the burden of proving factual basis for its charges by preponderant evidence, and its chosen disciplinary sanction cannot be arbitrary or capricious). The Board evaluated this evidence according to the governing legal requirements for employee removal, giving its decision a rational basis in the law.

■ Ali nonetheless argues that the MSPB's decision "was arbitrary, capricious and an abuse of discretion because the penalty exceeded policy guidelines for the sole of offense of an unexcused absence[,] especially for one that had no prior disciplinary record." Revisiting and elaborating upon her pretext argument, Ali contends that she committed only one actual violation, an unexcused absence; that the other alleged offenses (failure to follow proper leave procedures and carry out directions) were "really no more than a description of Ali's conduct that caused her to be guilty" of an unexcused absence; and that, even if each violation was a separate offense, all were one-time offenses, which carry a maximum penalty of

---

12. Count II does not challenge the MSPB's rulings on Ali's retaliation or discrimination claims. Therefore, we do not review these claims in the context of the MSPB's decision.

admonishment or reprimand. She cites *Power v. United States*, 209 Ct.Cl. 126, 531 F.2d 505 (1976), for the proposition that "a penalty grossly exceeding that provided by an agency's standard table of penalties may for that reason alone be arbitrary and capricious, even though such a table only provides suggested guidelines." But the evidence demonstrates that, far from exceeding the guidelines, Ali's punishment fits squarely within them.

The MSPB had an evidentiary basis for determining that Ali committed three separate violations, and that these violations justified Ali's removal. As discussed above, the VA's Table of Offenses lists an unexcused absence, ignoring or delaying carrying out instructions, and deliberate refusal to carry out supervisor's orders as **three separate** offenses. Nothing in the Table or its instructions requires the VA to merge these offenses simply because they arise from a common course of conduct. Moreover, the instructions explicitly permit imposing penalties greater than those listed "[w]hen an employee has committed a combination or series of offenses ...," including removal, if warranted by the facts of a particular case. Finally, the record supports a finding that Ali committed each of these offenses numerous times. Not only did the VA ask Ali to submit leave forms and medical documentation every few weeks, it asked her to provide those documents on a monthly basis. Ali ignored many of these requests and failed to furnish information for several of the months she was absent; the guidelines do not prohibit the VA from considering these to be separate transgressions.

In sum, the MSPB's decision is not arbitrary, capricious, an abuse of discretion, or contrary to law. Accordingly, we affirm the MSPB's decision sustaining Ali's removal.

## CONCLUSION

We emphasize that we are not passing on the wisdom of the VA's procedures and requirements for requesting leave. Some may think them onerous, especially for a person experiencing deep depression, and already disillusioned with her employer. Nevertheless, there is no evidence that enforcing these requirements in Ali's case was discriminatory, arbitrary, or otherwise unwarranted. The VA followed its rules, and wanted Ali to abide them as well.

The VA's Motion for Summary Judgment on Counts I and II is granted, and Plaintiff's Cross Motion for Summary Judgment on Count II is denied. The Clerk of the Court is directed to enter judgment in favor of the defendant pursuant to Fed.R.Civ.P. 58.